**Earl Dinschel, Plaintiff-Appellee, v. United States Gyp-
sum Company, a Corporation, and Shaw, Metz &
Associates, a Copartnership, Defendants, and Ragnar
Benson, Inc., Defendant-Appellant.**

Gen. No. 51,166.

First District, First Division.

May 15, 1967.

Rehearing denied June 12, 1967.

Vogel & Vogel, of Chicago (L. H. Vogel, Robert C. Vogel, Richard A. Walkovets, and David F. Holland, of counsel), for appellant.

Robert J. Hourigan and David G. Mountcastle, of Chicago (Robert J. Hourigan, of counsel), for appellee.

MR. JUSTICE BURMAN delivered the opinion of the court.

This is an action brought by plaintiff, Earl Dinschel, under the Scaffold Act, Ill Rev Stats 1965, c 48, §§ 60–69, to recover for personal injuries resulting when the scaffold on which he was working fell. Defendant, Ragnar Benson, Inc., was the sole defendant at the conclusion of the trial, all other defendants having been previously dismissed on motion of the plaintiff. Judgment was entered upon the verdict of the jury in favor of plaintiff in the sum of $60,000 and defendant appeals.

It is contended by the defendant that (1) plaintiff failed to prove an essential element of his case in that it was charged that defendant constructed the scaffold in question and no evidence supported such allegation; (2) the defendant was not in charge of the scaffolding in question or the work in connection with which it was used; (3) that the defendant, as general contractor was required by the prime contract to employ S. J. Reynolds Co., Inc., by reason whereof defendant was relieved of liability for any misconduct of the subcontractor; (4) that the defendant did not construct the scaffold and therefore is not chargeable with "knowingly" or "willfully" violating the Act where the subcontractor furnished a defective scaffold, the defect of which would not be apparent upon a customary inspection; (5) the trial court erred (a) in permitting plaintiff's counsel to read an excerpt from a prime contract and in refusing to permit the jury, on motion of the defendant, to hear explanatory provisions of the same, and (b) in refusing to admit in evidence the subcontract between defendant and S. J. Reynolds Co., Inc.; and (6) the defendant was entitled to a directed verdict or to a judgment notwithstanding the verdict of the jury.

On October 1, 1959, the defendant, Ragnar Benson, Inc., (contractor) entered into a prime contract with the United States Gypsum Company (owner) for the construction of the latter's Research Laboratory in Des Plaines, Illinois. S. J. Reynolds Co., Inc., was the plumbing subcontractor and employed the plaintiff, Earl Dinschel, as a journeyman plumber. A pipe scaffold was delivered to the construction site by Reynolds and had been used for about two weeks prior to the date of the accident. On June 1, 1960, the plaintiff and Edward Lenea were working at the construction site on the scaffold at a height of approximately 20 feet when the scaffold started to move and sway and suddenly fell to

469

the ground. Lenea escaped injury by being thrown onto a girder but the plaintiff fell to the concrete floor and suffered severe injuries.

The defendant insists that he did not have the "right to control" the work of Reynolds, the subcontractor, as that authority was "circumscribed and limited by the prime contract." He argues that under the prime contract the authority and true control of the doing of the work, even to the selection of the subcontractors to be used, was and remained in the architect, who therefore, having in all respects the power of direction, was in complete charge of doing the work. He states that in this important particular the case at bar is clearly distinguished from Larson v. Commonwealth Edison Co., 33 Ill2d 316, 211 NE2d 247.

We are therefore required to consider the terms of the prime contract between the defendant and the owner to determine whether the architect and not the general contractor was in charge of the construction. The contract, issued by the American Institute of Architects, is headed as "the standard form of agreement between contractor and owner for construction of buildings" and was executed by Ragnar Benson, Inc., contractor, and the United States Gypsum Co., owner, on October 1, 1959. The parts of the agreement relevant to the issues are briefly these. Under Article I Ragnar Benson agreed to perform all the work as shown by the drawings and described in the specifications prepared by the architects. A lump sum was to be paid the contractor in the amount of $1,621,831 including the plumbing work in the amount of $104,275. Under Article 7, Section "B" it is stated, "Plumbing Work covered by Section 3 of Specification SMD #5906, Volume 2. Plumbing contractor to be S. J. Reynolds Co., Inc."

The prime contract also incorporated another agreement executed by the same parties which is headed as "the general conditions of the contract for the construc-

tion of buildings." Article I (c) of that contract states "the term Subcontractor, as employed herein, includes only those having a direct contract with the Contractor . . . ." Under Article 9 it provides that the contractor shall pay for all materials, labor, etc. Article 12 headed "Protection of Work and Property" provides in part that:

The Contractor shall take all necessary precautions for the safety of employees on the work, and shall comply with all applicable provisions of Federal, State and Municipal Safety laws and building codes to prevent accidents or injury to persons on, about or adjacent to the premises where the work is being performed. He shall erect and properly maintain at all times, as required by the conditions and progress of the work, all necessary safeguards for the protection of workmen . . . .

Article 36 headed "Subcontracts" provides:

As soon as practicable and before awarding any subcontracts, the Contractor shall notify the Architect in writing of the names of the subcontractors proposed for the principal parts of the work, and for such other parts as the Architect may direct, and shall not employ any to whom the Architect may have a reasonable objection.

If before or after the execution of the Contract, the Contractor has submitted a list of subcontractors which has been approved by the Architect, and the change of any subcontractor on such list is required by the Owner after such approval, the contract price shall be increased or decreased by the difference in cost occasioned by such change.

The Contractor shall not be required to employ any subcontractor against whom he has a reasonable objection.

471

The Architect shall, on request, furnish to any subcontractor, wherever practicable, evidence of the amounts certified on his account.

The Contractor agrees that he is as fully responsible to the Owner for the acts and omissions of his subcontractors and of persons either directly or indirectly employed by them, as he is for the acts and omissions of persons directly employed by him.

Nothing contained in the contract documents shall create any contractual relation between any subcontractor and the Owner.

In Article 37 both contractor and subcontractors reciprocally agree to be bound to each other and to assume toward each other "all the obligations and responsibilities that" each "assumes toward the Owner."

■■ The defendant strongly maintains that he was not a free agent in selecting subcontractors as under the prime contract he was required by the architect to employ Reynolds as the plumbing subcontractor. He says, "the architect, therefore, was in all respects in complete charge of and had the power of direction in all matters in connection with the work," whereof defendant was relieved from any misconduct of the subcontractor. We do not agree. Even assuming that the architect was in charge of the work, but was jointly liable with the defendant, it would not absolve the contractor. Griffiths & Son Co. v. Fireproofing Co., 310 Ill 331, 141 NE 739. Although the term "having charge of" may include supervision and control it is not confined to it, but must be determined by the associations and circumstances surrounding its uses. Larson v. Commonwealth Edison Co., 33 Ill2d 316, 211 NE2d 247. The Court in Larson went on to explain that:

Rather, consistent with its beneficent purpose of preventing injury to persons employed in the extra-

hazardous occupation of structural work, *the thrust of the statute is not confined to those who perform, or supervise, or control, or who retain the right to supervise and control, the actual work from which the injury arises, but, to insure maximum protection, is made to extend to owners and others who have charge of the erection or alteration of any building or structure.* (Emphasis ours.) P 322.

█ Under the prime contract with the owner, the defendant was employed as the general contractor for the complete construction of the building. While the architect designated the Reynolds Company in the contract as the plumbing subcontractor it was agreed under the terms of the contract that the contractor was not required to employ any subcontractor against whom he had a reasonable objection. We find no evidence in the record that the defendant objected to the Reynolds Company. By the terms of the contract the defendant contractor agreed that he would be fully responsible for the acts and omissions of his subcontractors; that he "shall take all necessary precaution for the safety of employees on the work," and "shall erect and properly maintain at all times, as required by the conditions and progress of the work, all necessary safeguards for the protection of workman." Moreover, the contractor under Article 37 specifically took the responsibility to bind every subcontractor to the terms of the agreement. The subcontractors, including Reynolds, were paid by the defendant and responsible only to that firm. In our judgment the defendant had complete control of the plumbing contractor within the meaning of Larson.

The defendant next contends that the trial court erred in permitting plaintiff's counsel to read an excerpt from Article 12 of the general conditions of the contract, concerning defendant's undertaking relative to safety on the job site, and in refusing to interpret and explain the same to the jury. The record reveals that during the

473

trial the prime contract between the defendant and Gypsum was received in evidence without objection. Counsel for plaintiff requested permission of the court to read to the jury only those portions of the general conditions that were applicable to the case as most of it was not material. Defense counsel objected to reading a part of the contract and said, "If some of it goes to the jury all of it should. In any event, I submit it is a question of legal interpretation for the court." It was the contention of the defendant that the contract should not be read or submitted to the jury, but "it is the province of the Court to interpret and submit its interpretation of these contracts and the legal effect thereof to the jury by way of instructions." Counsel for plaintiff countered that counsel for defendant could read to the jury the parts of the contract he thought relevant.

The court commented that he didn't see the need to interpret the contract to the jury and stated that plaintiff's counsel could read to the jury the parts he was interested in and were relevant and that the defense counsel could do likewise. Defense counsel again objected to the reading of the excerpts and insisted the entire contract should go to the jury with written instructions. The trial judge ruled that the excerpts of portions of Article 12 of the prime contract which were discussed in chambers could be read to the jury. Defense counsel then requested that portions of the defendant's contract with Reynolds should then be read to the jury and during his defense he offered that contract in evidence which was objected to, and after discussion the court sustained the objection.

■ ■ It is clear from the record that after due consideration the trial judge concluded that not all of the provisions of the prime contract were relevant to the issues and after examining the document we agree. The defendant did not claim the contract was ambiguous. The court properly offered to permit the respective counsel to

474

read relevant excerpts from the contract to the jury and defendant's counsel did not choose to do so. The court also ruled that the contract between the defendant and the subcontractor, who was not a party to the suit, was irrelevant. Whether the admission of such evidence was admissible is a matter within the discretion of the trial judge. The trial court has the right to refuse evidence which will serve no useful purpose in the trial or which is incompetent to prove an issue. Stenwall v. Bergstrom, 405 Ill 281, 90 NE2d 778. See also Kennerly v. Shell Oil Co., 13 Ill2d 431, 150 NE2d 134.

It is further contended that defendant did not willfully or knowingly violate the Scaffold Act because he had no knowledge of the latent defect in the scaffold. He argues that the only evidence tending to establish a defective scaffold was testimony that the leg which broke failed because of fatigue or because of a slit or weld which was not apparent upon examination until after the accident, and that there is no liability when injuries result from latent defects, citing Illinois Steel Co. v. Laughran, 136 Ill App 432. In that case, which did not involve the Structural Work Act, a fireman, employed by the Steel Company was injured when a boiler which had been used for over two years exploded. It was held that employers were not insurers against injuries to employees which occurred from pure accident. It was pointed out that the usual and ordinary tests for determining the safety of the boiler had been taken, but were inadequate to discover the defect without taking out all the boiler tubes and hammering them under excessive pressure. It was held that the employer was not liable for latent defects in the boiler which could not have been known to him after a proper inspection.

In our opinion the Illinois Steel Co. case is not applicable and differs from the instant case. That case did not involve the Scaffold Act and occurred before the first Illinois Workmen's Compensation Act. There the

plaintiff had to establish negligence on the part of the employer and the employer's defense was assumption of risk. Under the Scaffold Act there is no defense of assumption of risk and to insure maximum protection in the extrahazardous occupation the liability of the employer and other persons is made to extend not only to those persons who actually erect a scaffold, but also to others who have charge of the erection or alteration of any building or structure. Gannon v. Chicago, M., St. P. & P. Ry. Co., 22 Ill2d 305, 175 NE2d 785; Larson v. Commonwealth Edison Co., 33 Ill2d 316, 211 NE2d 247.

Structural work frequently involves the operations of contractors, subcontractors, and architects who are in charge of a phase of the work, and the injured person has a right of action against any one of them, in addition to his employer, who may willfully violate or fail to comply with the Act. Gundich v. Emerson-Comstock Co., 21 Ill2d 117, 171 NE2d 60. The Act requires that all scaffolds used in the erection of a structure shall be so erected, placed and operated as to give proper and adequate protection to the life and limb of any person employed or engaged thereon. It provides further that for "any injury to person or property, occasioned by any wilful violations of this act, or wilful failure to comply with any of its provisions, a right of action shall accrue . . ." (Ill Rev Stats 1965, c 48, § 69.) All persons in "charge" of the work are liable not only when the dangerous conditions are known to them, but also when by the exercise of reasonable care the existence of such dangerous conditions could have been discovered and become known to them. Kennerly v. Shell Oil Co., 13 Ill2d 431, 150 NE2d 134. The evidence is clear in the case at bar that the scaffold was defective in willful violation of the Act. The Statute puts absolute and unconditional liability on the person or persons who have charge of the work wherein a scaffold or hoist is used.

Otherwise workmen engaged in a hazardous employment would not be afforded the protection given under the Act.

██ ██ Furthermore the record does not support defendant's argument that the sole cause of the accident was metal fatigue. There was testimony (1) that the scaffolding customarily used on a job of this type is "patent scaffolding" which is of a heavier type than the involved scaffolding; (2) that there was no second stage to the scaffolding, which would have increased the ground area, as was the custom when working that high; (3) that slits had been cut in the legs and 18-inch extensions with wheels were added without pins or cross-bracing as there was in the upper sections of the scaffold; and (4) that while the scaffold had been used for ten days on the job the defendant's superintendent did not inspect it. Under the facts and circumstances the question of what constitutes a safe, suitable and proper scaffold under the Act is at most a disputed question of fact, which must necessarily be left to the jury for determination. Oldham v. Kubinski, 37 Ill App2d 65, 185 NE2d 270.

For the reasons given above the judgment of the Circuit Court is affirmed.

Judgment affirmed.

MURPHY, P. J. and ADESKO, J., concur.