Rex Mundt, Plaintiff-Appellant, *v.* Ragnar Benson, Inc., *et al.*, Defendants-Appellees.

(No. 56324;

First District (2nd Division)—March 5, 1974.

*Rehearing denied May 1, 1974.*

Horwitz, Anesi, Ozmon & Associates, Ltd., of Chicago (Nat P. Ozmon, Joseph Cerveny, and Dario A. Garibaldi, of counsel), for appellant.

Kirkland & Ellis, of Chicago (William D. Maddux and Gary M. Elden, of counsel), for appellee Ragnar Benson, Inc.

John W. Purney, of Chicago, for appellee Western Electric Company, Inc.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Rex Mundt, plaintiff-appellant (hereinafter plaintiff), was injured on December 20, 1965, when he fell during the construction of a four-story building owned by defendant-appellee Western Electric Company, Inc. (hereinafter Western Electric). At the time of his fall, plaintiff was in the employ of the Corbetta Construction Company, which company was a subcontractor for the concrete work on the project. Defendant-appellee Ragnar Benson, Inc. (hereinafter Ragnar Benson) acted as "management contractor" for the construction of the building.

In 1966, plaintiff brought suit, based on a common law negligence theory, against: Western Electric, as owner of the building; Ragnar

Benson, as "management contractor" for the construction; the architectural firm of Holabird and Root, which was party to a contract with Western Electric under which it had responsibility for all design drawings and documents related to the construction; and Bell Telephone Laboratories, as an additional "owner, operator, or possessor" of the building.

The record presented here is unclear as to the disposition of the case with respect to Holabird and Root, the architects. It was explained by counsel during argument before this court, however, that the firm was directed out of the case at some point during the course of the proceedings in the court below.

Prior to trial in the court below, summary judgment was entered with respect to Bell Telephone Laboratories, the court finding that no triable issue of fact existed relative to Bell; Bell is not a party to this appeal.

On two occasions in the trial court (after the jury had been sworn, but before the trial commenced; and after the close of plaintiff's case), plaintiff requested leave of court to file an amended complaint. Pleading the same allegations of fact as had been made in the original complaint, it would have added a second count alleging a cause of action based upon the Illinois Structural Work Act (Ill. Rev. Stat. 1971, ch. 48, par. 60 et seq.). The trial court refused to permit plaintiff leave to file the proposed amendment.

At the close of plaintiff's case, the trial court directed verdicts in favor of Western Electric and Ragnar Benson with respect to the common law negligence count. Plaintiff appeals from the entry of the order denying him leave to file the amended complaint, as well as from the order directing verdicts in favor of defendants.

The seminal issues presented to this court on review are: (1) whether the court below properly refused to permit plaintiff leave to file an amended complaint, count two of which was based upon the Illinois Structural Work Act; and (2) whether the court below erred in directing verdicts for Western Electric and Ragnar Benson in the action for common law negligence.

It would be helpful at the outset to summarize the common law negligence complaint filed in 1966 by plaintiff against defendants Western Electric and Ragnar Benson. The complaint alleged, inter alia, that on December 20, 1965, plaintiff was engaged in construction work, in the employ of Corbetta Construction Company, at the premises of Western Electric located at Wheaton and Warrenville Roads in Du Page County, Illinois; that Ragnar Benson was the general contractor in charge and control of the construction being performed on said premises; that Holabird and Root were the architects in charge and control of said construction; that Western Electric was the owner of the premises; that all

the named defendants were in charge and control of said construction; that plaintiff was in the exercise of due care and caution for his own safety; that the defendants, on the day in question, had the duty to maintain, operate, and control the construction work in a safe, suitable, and proper manner so that plaintiff, while at work, would not be injured; that, notwithstanding the aforesaid duties, defendants were guilty of one or more of the following acts or omissions constituting negligence: (a) allowed work areas to be poorly lighted for night work; (b) failed to use due care in inspecting the condition of their premises; (c) failed to provide warnings or barricades around openings for workers on the premises; (d) failed to provide adequate lighting for night work; (e) failed to warn plaintiff of an existing unsafe condition; (f) failed to retain sufficient and proper control over the construction work; (g) failed to illuminate the work areas and openings in the floor at the construction site at night; and, finally, that as a direct result of defendants' negligence, plaintiff was caused severe injury when he fell through an opening from the fourth floor to the third floor at the building site. Plaintiff prayed for judgment in the amount of $150,000 against each of the named defendants, including Western Electric and Ragnar Benson.

Plaintiff's employer Corbetta Construction Company, as a subcontractor for Ragnar Benson, was under contract to build the concrete floors under construction at the time of plaintiff's accident. Using 4' x 8' pieces of plywood, Corbetta employees would build temporary wooded floors, "decking," and then proceed to cover those floors with concrete. When the concrete had hardened, they would remove the temporary flooring from below. Whenever it was necessary to leave a hole in the concrete floor for the future installation of an elevator or an air duct, Corbetta employees were supposed to nail four boards into a square and then nail the square to the temporary wooden floor before the concrete was poured. Consequently, the concrete would harden around the square and leave a hole in the final concrete floor. When the temporary flooring was removed, leaving a hole in the floor, it was customary procedure for a Corbette workman to cover or barricade the hole. Larger holes, those for elevator shafts and the like, were barricaded; smaller holes, those for air ducts, were generally supposed to be covered by hatch covers or by sheets of plywood, which were to be nailed from their upper surfaces to the wooden baffle square which was still in place, or themselves "cleated" by pieces of wood nailed to their undersurfaces so that when they were placed over the openings in the concrete floor, the "cleats" would prevent them from slipping or sliding off the opening.

SUMMARIES OF THE TESTIMONY AT TRIAL:

Plaintiff testified, in pertinent part, that on December 20, 1965, he was employed on the night crew by Corbetta Construction Company,

for whom he had worked since August, 1965. He had started out with Corbetta as a general laborer and would occasionally help with the wrecking crew. He had worked as a laborer for 20 years. At the time of the accident, his duties were to take care of recently poured concrete on Western Electric's building, making sure that it was completely covered and that heaters and thermometers were properly positioned in the bottom of the concrete forms and on top of the concrete slabs after they had been covered. The covering procedure was this: the concrete floors were covered with graphite paper; blankets were then placed on top of the paper; and, finally, any available material nearby was laid on top of the blankets to make certain the blankets did not blow away. The concrete could be covered approximately 1½ to 2 hours after it had been poured.

Plaintiff's accident occurred at approximately 8:30 P.M. on December 20, 1965, at which time plaintiff and a helper, Edward Malcom, another Corbetta employee, were engaged in covering concrete in an area which had been poured that day, an area to which we will refer as the south bay. (The bays upon which plaintiff worked were approximately 30 feet wide and anywhere from 80 to 100 feet long.) The materials used by plaintiff to cover the recently poured concrete (the graphite paper, and so forth) were usually left by the day crew in the bay adjacent to that which had most recently been poured; in other words, on the evening in question, as plaintiff was working in the south bay, the materials he would use would usually be set up by Corbetta employees in the next adjacent bay, in this case what we will refer to as the north bay. The materials were set up in the north bay that night.

Immediately prior to his accident, plaintiff and Malcom ran out of graphite paper with which to cover the south bay. Plaintiff estimated, variously, in this testimony that he and Malcom needed 5 or 10 or 20 feet more of the paper with which to complete the job. Plaintiff informed Malcom that he (plaintiff) would go over to the north bay to get the balance of the graphite paper necessary. The south bay was illuminated by a portable floodlight of approximately 175 to 200 watts, which plaintiff would carry around with him while doing his work. In addition to the floodlight, plaintiff used a flashlight while he covered the cement.

At the moment the pair ran out of paper, plaintiff was in the southwest corner of the south bay. He proceeded along the west wall of the south bay into the north bay. Light conditions varied from bay to bay, and, in the north bay, there was no light at all. When plaintiff went for the paper, he carried his flashlight with him; it was lit. He did not take the floodlight.

There was "material" lying all over the north bay: plywood, two-by-fours, and four-by-fours. Plaintiff proceeded to the north end of the north

bay, all the while flashing his light around. At approximately the middle of the north end of the north bay, plaintiff saw a four-feet-by-eight-feet piece of plywood, which was lying flat against the graphite paper on the floor. He shined his light down on the plywood. He placed his flashlight in his hip pocket and reached over to pick up the plywood by its width, the four-feet side, in order to get at the graphite paper he sought. He used both hands to lift the plywood, which was "heavy," and as he hoisted it up almost as high as his head, plaintiff stepped forward and into a hole covered with graphite paper. He fell from the fourth floor to the third floor.

Plaintiff also testified that he had previously seen the hole into which he fell before it had been covered with graphite paper; further, he testified he may have covered the hole through which he fell.

At the time of plaintiff's accident, Earl Hauge was plaintiff's immediate supervisor, as labor foreman for Corbetta. He testified that Corbetta was the subcontractor working on the subject construction for Ragnar Benson, the management contractor. Herbert Johnson, the general superintendent for Ragnar Benson, was on the job site and worked in conjunction with Hauge's superintendent, Larry Forst. Ragnar Benson also had other people at the construction site.

Western Electric had Robert Morton from its plant design and construction department and two or three other inspectors at the site all the time. Ragnar Benson and Western Electric shared a temporary office at the site, and Western Electric's "inspectors in the field" checked the progress of the construction. Morton checked the "whole job." In the chain of command for the construction work, first would come Morton, then Johnson.

Hauge in this testimony described the construction of the floors at the building site. In erecting a floor or bay, shoring and stringers were used. Above the shoring, which ran from the floor below to the ceiling above, there would be a deck made of four-feet-by-eight-feet pieces of plywood. Generally, the procedure to be followed with respect to openings in the floors left for duct work and pipes was to cover them over with plywood. Corbetta employees bore the responsibility of so covering the holes.

On the day of plaintiff's accident, it began to get dark at approximately 5 or 5:30 P.M. Strings of lights were attached underneath the boards on the floors where Hauge's men worked so that the men could see properly in maintaining the heaters, which were there to facilitate the drying of the recently poured cement; there were also strings of lights put up for the cement finishers to enable them to finish the pour; and Hauge could, if he felt the need, get electricians to string lights. There would be very little lighting in an area where either pouring or finishing was not in progress and merely a bulb or two in areas where Hauge's

men were not working during the dark hours. Electricians were responsible for stringing lights in the areas where work was not in progress.

Hauge further testified that on occasion his men would run short of graphite paper used in their covering operations; it was nothing unusual. When the squares were taken away during the "stripping" operation, a piece of plywood was usually put over any holes remaining in the floors, but the men did not immediately run up to the floor above and cover the hole with plywood; that was customarily done after they left the job. Covering holes was the best practice. The graphite paper and blankets were removed before the plywood and forms so that, if the stripping were removed from a portion of the deck, usually Hauge would expect that the paper and blankets had been removed earlier.

Herbert Johnson, the general superintendent of the subject construction for Ragnar Benson, testified, as an adverse witness under section 60 of Illinois' Civil Practice Act, that his duties included coordinating the activities of the subcontractors as to the plans and specifications of the building, coordinating his own staff, and carrying the responsibility, when work fell behind schedule, of seeing to it that the work got caught up. On occasion, he and three or four of his men would go to the Western Electric building site where Ragnar Benson maintained a field office to check the work progress. Johnson further testified that Western Electric had approximately six men on the job site, in addition to one Mr. West, who acted as project manager for Western Electric; that once a week general construction meetings were held at which Western Electric was in charge; that matters of job safety were brought up at those meetings; that, in walking around the job site, he observed conditions which he felt would be hazardous to the men working on the job; that, having made these observations, he would leave it to Corbetta Construction to take care of any hazards to protect the men on the job; that usually he and his staff would undertake daily inspections of the construction area; that he had been up to inspect the lighting which had been strung out in the building as it was being erected; that, as a general practice, lights were kept burning night and day on a construction job even in areas where work was not proceeding; that Ragnar Benson's subcontractor (the electrical contracting firm of Fischbach, Moore & Morrisson) had the responsibility to see that the temporary lights were on in the building at all times; that he and his men checked to see that the lights were on; that "We [Johnson and his staff] don't let anyone work on the job without any lights"; and that, as a matter of practice, the general contractor made sure that the subcontractor does the work in accordance with what the subcontractor was supposed to do.

The following colloquy, with respect to the hole through which plaintiff fell, took place later in Johnson's testimony:

"A. * * * I saw the plywood from underneath. When I stood down below there when I came up on the fourth floor I saw it laying on the floor or over this opening, and the next day when I got to the pour I was wondering how a man could fall through it when there was a piece of plywood on it.

Q. Did you notice anything in addition to the plywood being on the covering that you observed the day before? Was it secured to the wood in any way?

A. It was secured to the bulkhead that was left in the concrete slab.

Q. How was it secured to it?

A. With nails.

Q. Now, by that you mean the plywood was nailed to the wood that was used for the forming of the hole?

A. Yes."

Robert Morton testified that at the time of plaintiff's accident he was in the employ of Western Electric as one of the engineers on the construction job at Bell Laboratories; that his primary function was that of civil engineer in the structural design of concrete and structural steel; that, in addition to himself, Western Electric had five other representatives at the construction site; that he represented Western Electric to see that the building was built in accordance with plans and specifications; that all aspects of the job were let on a contract basis; that Ragnar Benson was management contractor for the job; that Western Electric employed a department chief who was directly in charge of the job, who reported to one Fred Best, who in turn reported to Western Electric; and that, in addition to Ragnar Benson dealing with subcontractors, it was his (Morton's) responsibility to deal with subcontractors directly.

Morton further testified that it was his responsibility to go to the job to make sure that holes left in the concrete were in the proper position and that he would look at the holes; that, as a representative of Western Electric, he was always concerned with safety and that, in fact, Western Electric would always bring up safety matters at their general meetings; that at one meeting it was discussed that manholes and other openings should be covered with plywood and pits should be barricaded; that at another meeting, it was discussed that better job safety precautions were to be observed; that it was further suggested that cleats should be provided on bottom surfaces of plywood being utilized to cover openings in the floor slabs; that if he observed an unsafe condition, he would report it directly to his department chief or to the assistant manager, and then would also report the unsafe condition to Ragnar Benson personnel; that one George Dvorak of Western Electric was responsible for dealing with electrical contractors on the construction job; and that if any com-

plaints came to him (Morton) with respect to electricity on the job site, he would in turn report it to Dvorak.

William DeLisle testified that at the time of plaintiff's accident he was employed by Walter H. Flood Company of Chicago, which firm operated as consulting engineers on the materials used in connection with the subject construction—concrete, asphalt, and metal products; that he worked at the construction site at the time of the accident; that his employer had been hired by Western Electric; that his duties were to maintain quality control of the concrete mix used in the slabs; that he reported to Robert Morton of Western Electric on the job site; that he had complained about the lighting on the site to Robert Morton; that these complaints were made on more than one occasion, and that they had been made at least three times during an approximated three-week period beginning November 13, 1965; that, to his knowledge, the lighting conditions had never been corrected up until and including the day on which plaintiff was injured; that, concerning the openings in the concrete, the larger shafts were barricaded with two-by-four barricades, but the smaller holes in many instances were not covered; that plywood covered underneath the holes; and that after the plywood was stripped away, the hole from the fourth floor to the third floor would be open.

Jacque Albrecht testified that at the time of plaintiff's accident he was deputy sheriff for the DuPage County Sheriff's Office, and that on December 20, 1965, he was called to the Bell Laboratories construction site to investigate plaintiff's accident; that, as he stood near plaintiff on the third floor, he looked up to the hole through which plaintiff had fallen and could see no light shining through the hole; that he went up to the fourth floor and proceeded to where he thought the hole might be; that it was fairly dark and he had to use his flashlight to get to the vicinity of the hole; that there was light on the third floor, as he recalled, but he saw no light on the fourth floor; that, when he looked around the hole while on the fourth floor, he saw tar paper and another substance which he called cellophane; that there were strings of lights up around the fourth floor, of approximately 150 to 200 watts, but when he went to the vicinity of the hole, there were no lights around that area; and that there was a piece of plywood lying next to the hole.

Edward Malcom, plaintiff's helper on the evening of the fall, corroborated plaintiff's version of the covering procedures which he and plaintiff had been engaged in prior to plaintiff's accident. He further testified that, on the evening in question, at least six pieces of plywood had been dumped in the north bay; that the plywood pieces were utilized on top of the blankets to hold them down, in addition to being used for decking, and that occasionally the plywood sheets were used to cover openings or holes in the concrete; that in the area where the

plaintiff had fallen, there was no light; that he did not know that the opening through which plaintiff had fallen was there; that he and plaintiff had not covered the area where plaintiff had his accident, and that neither he nor plaintiff had put the piece of plywood over the hole; that the hole was not barricaded; that plywood should have been placed over holes before graphite paper was laid to make things safer; and that there was plywood laying around the north bay.

Other persons testified in the court below, but their testimony need not concern us. The above summaries are sufficient for the purpose of resolving the issues presented here.

## I.

The first issue presented for resolution is whether the court below properly refused to permit plaintiff leave to file an amended complaint incorporating a count based upon the Illinois Structural Work Act. The record before us discloses that the lawsuit predicated upon a common law negligence theory was filed in September of 1966 and that the case was set for trial on June 7, 1971. The judge presiding in the court below, Hon. Walter J. Kowalski, made this statement for the record on June 9, 1971, with respect to plaintiff's counsel's conduct relative to amending the complaint:

> "No, I will reserve my ruling on leave to grant the amended complaint. I want the record to show this case as called up for trial on June 7th came up before me approximately at 2:30 in the afternoon. There appears to be unprepared negligence on the part of the plaintiff to proceed with the case at this time. The case came before me on the morning of the 8th. The counsel who came in on the case assumed that there was a Structural Work Act count, and it was first—after brought to his attention there was no such count that [sic] the question of probably no complaint or amended complaint had been filed.
>
> I indicated at this time that I probably would not allow under those circumstances an amended complaint to be filed. We then proceded [sic] to select a jury, after I informed the prospective jurors that this case was predicated strictly on a negligence count. However, I did advise counsel for the plaintiff that I would reconsider his amended complaint if and when he came and brought it to my attention.
>
> At this time I heard arguments. I will reserve a ruling."

In other words, prior to the swearing of the jury, plaintiff's counsel realized that the complaint on file did not contain a Structural Work Act count. However, counsel did not move the court for leave to amend the complaint until after the jury had been selected and sworn, that is, on

the day of trial, though the original complaint had been filed nearly five years earlier. After hearing argument on plaintiff's motion to amend on the day of trial, the court below reserved ruling on the matter. At the close of plaintiff's case, the motion for leave to amend was renewed, argument was had as to whether plaintiff had made out a Structural Work Act case, and plaintiff's motion for leave to amend was denied.

Section 46 of Illinois' Civil Practice Act (Ill. Rev. Stat. 1969, ch. 110, par. 46) provides a liberal procedure for amendments to the pleadings at any time prior to final judgment so that claims or defenses may be changed or causes of action or cross-demands added.

■■ Trial courts across the State look to section 46 for direction in considering amendments to pleadings in all manner of cases brought before them, and, as we said at page 276 in *Wiegel v. One La Salle Co.* (1st Dist. 1966), 75 Ill.App.2d 272, 221 N.E.2d 117, "* * * the discretion of the trial court in considering whether to allow an amendment is broad and will not be upset absent some clear showing of abuse." This principle has been stated again and again. *Klinke v. Great Northern Life Insurance Co.* (4th Dist. 1943), 318 Ill.App. 43, 54-55, 47 N.E.2d 506; *Nitrin, Inc. v. American Motorists Insurance Co.* (3rd Dist. 1968), 94 Ill.App.2d 197, 205, 236 N.E.2d 737; *Ennis v. Illinois State Bank of Quincy* (4th Dist. 1969), 111 Ill.App.2d 71, 75-76, 248 N.E.2d 534; *Brockob Construction Co. v. Trust Co. of Chicago* (1st Dist. 1955), 6 Ill.App.2d 565, 570, 128 N.E.2d 620; and *Nurnberger v. Warren & Van Praag, Inc.* (5th Dist. 1971), 133 Ill.App.2d 843, 851, 272 N.E.2d 234.

The issue of whether trial courts have exercised this broad discretion properly in refusing to permit parties leave to amend on the day a case was ready for trial, as in the case at bar, has also received consideration by the court. In *Friestedt v. Chicago Transit Authority* (1st Dist. 1970), 129 Ill.App.2d 153, 262 N.E.2d 771, plaintiff made a motion on the day of trial to be permitted to amend his complaint by adding a fact of which he had been aware for five years. The trial court concluded that the defendant in *Friestedt* had the right to rely upon the allegations pleaded and that the plaintiff had slept upon his rights. We affirmed the trial court's conclusion.

*Ennis v. Illinois State Bank of Quincy, supra,* concerned a motion to amend a complaint in equity to set aside a will and codicil, which motion was not made until the day of trial. The trial court denied the motion, and we affirmed that decision, stating at pages 75-76:

> "[P]arties do not have an absolute right to amend their pleadings. Amendments are only permitted at the trial court's discretion. This point has particular significance in deciding the appeal of the case under consideration because our courts have had two divergent policies— a policy favoring liberal amendments of plead-

ings and a policy against unduly restricting a trial judge in matters falling generally within his discretion. The determining factor for overruling a judge's disallowance of a motion to amend must be found in a 'clear abuse of his discretion,' considering the peculiar facts and circumstances of the case and the impact upon all the parties in permitting or not permitting the motion."

The *Ennis* court then went on to find that the record before it disclosed no valid reason why the subject matter of the amendment had not been included in the original pleading, or the amendment offered sooner than the day of the trial.

■■ In the case at bar, the tendered amended complaint presented a wholly new statutory cause of action to the court and the defendants; the amendment was offered more than 5 years[1] after the accident in which plaintiff was involved and nearly 5 years after the original complaint had been filed. The pleadings in the case had apparently been settled for months, and the facts constituting the alleged new cause of action were well known to the plaintiff since the day of his accident. Under such circumstances, an application for leave to amend a complaint is addressed to the sound discretion of the trial court, and there being no reasonable explanation in the record as to why this count based upon Illinois' Structural Work Act had not been presented in a complaint long before the calling of the case for trial, the court below properly refused to permit the same.

Plaintiff relies heavily upon *Halberstadt v. Harris Trust & Savings Bank* (1st Dist. 1972), 7 Ill.App.3d 991, 289 N.E.2d 90, and *O'Leary v. Siegel* (1st Dist. 1970), 120 Ill.App.2d 12, 256 N.E.2d 127. The reliance is misplaced in each instance. In both *Halberstadt* and *O'Leary,* this court affirmed the allowance of amendments made in the trial courts, and, in so doing, reaffirmed again the principle stated above that such rulings will not ordinarily be disturbed unless a clear abuse of the court's discretion can be shown.

Turning now to the trial court's refusal to permit plaintiff to amend his complaint after he had presented his case, the court, it is evident from the record, found that plaintiff's proof had been insufficient to make out a case under Illinois' Structural Work Act.[1] Accordingly, the court below denied plaintiff's motion for leave to amend at the close of plaintiff's case. Plaintiff, on appeal, challenges the propriety of that denial, claiming that he had demonstrated every element of his cause of action under the Structural Work Act by overwhelming and abundant evidence and that the trial court's conclusion of law that the Act did not apply to

---

[1] The trial court did not actually state a specific reason for his ruling. A reading of the arguments of counsel and colloquy before the court prompts us to draw the above-stated conclusion.

the circumstances of the case at bar is contrary to interpretations of the Act, and its elements, by the courts of this State.

Sections 60 and 69 of Illinois' Structural Work Act (Ill. Rev. Stat. 1969, ch. 48, par. 60 *et seq.*) provide, in pertinent part:

Section 60:

"[A]ll scaffolds * * * stays * * * supports, or other mechanical contrivances, erected or constructed by any person, firm or corporation in this State for the use in the erection * * * of any * * * building * * * or other structure, shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon * * *."

Section 69:

"Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction * * * of any building * * * or other structure within the provisions of this act, shall comply with all the terms thereof * * *.

* * *

For any injury to person or property, occasioned by any wilful violations of this act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby * * *."

Plaintiff, in his brief before this court, delineates the following elements of a cause of action based upon the Structural Work Act, urging all the while that the evidence in the court below, as well as the interpretations of the Act made by this State's courts of review, compel the reversal of the trial court's decision to refuse to allow plaintiff's amendment:

1) That defendants Western Electric and Ragnar Benson, as an owner and a general contractor, respectively, had charge of the erection and construction of the subject building under the provisions of the Act;

2) That the "scaffolds, hoists * * * stays * * * supports, or other mechanical contrivances, erected or constructed" by defendants for the use in the erection of the subject building were not "erected and constructed, in a safe, suitable and proper manner" or were not "so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb" of plaintiff, who was "employed or engaged thereon";

3) That defendants' failure to comply with the Structural Work

Act was a "wilful violation" and a "wilful failure to comply with its provisions" within the meaning of the Act;

4) That plaintiff was employed or engaged on a permanent part of the building under construction which was being used temporarily as a scaffold, support, or stay within the meaning of the Act; and

5) That the proximate cause of the plaintiff's injuries was the failure of the defendants to comply with the provisions of the Structural Work Act.

At the outset, based on our resolution of this point, we shall note that: (i) in our opinion, defendants did have "charge of" the subject construction within the Act's provisions (see *Larson v. Commonwealth Edison Co.* (1965), 33 Ill.2d 316, 211 N.E.2d 247); and (ii) the structure upon which plaintiff was working is included within the term "scaffold" under the Act, as interpreted in this jurisdiction (see *Louis v. Barenfanger* (1968), 39 Ill.2d 445, 236 N.E.2d 724); and that the evidence established that the scaffolding was not erected and constructed in a "safe, suitable and proper manner" and was not "erected and constructed, placed and operated as to give proper and adequate protection to the life and limb" of plaintiff who was "employed or engaged thereon."

The third essential element plaintiff sought to prove, so as to enable him to amend his complaint to include the Scaffolding Act count, is, we feel, the heart of the matter. Was plaintiff's injury occasioned by any *wilful* violation or *wilful* failure to comply, by the defendants, with any of the provisions of the Structural Work Act?

■■ Initially, it can be said that there can be no liability under the Illinois Structural Work Act without evidence that the Act was violated and that such violation was "wilful."

■ In *Kennerly v. Shell Oil Co.* (1958), 13 Ill.2d 431, 439, 150 N.E.2d 134, our supreme court, in referring to the term "wilful violation" of the Scaffold Act, reaffirmed its previous interpretation that the word "wilfully" is synonymous with "knowingly." (See also *Lavery v. Ridgeway House, Inc.* (1st Dist. 1969), 117 Ill.App.2d 176, 186, 254 N.E.2d 117; *Gundich v. Emerson-Comstock Co.* (1960), 21 Ill.2d 117, 128, 171 N.E.2d 60.) As we said at page 897 in *Isabelli v. Cowles Chemical Co.* (1st Dist. 1972), 7 Ill.App.3d 888, 289 N.E.2d 12:

> "Our courts have consistently held that the word "wilful" as used in [the Structural Work Act] is quite different from the familiar phrase 'wilful and wanton'. The essence of the Structural Work Act is not to be found within the concept of knowing or intentional misconduct or even that of reckless disregard. Liability exists where the existence of dangerous conditions could have been ascertained by the exercise of reasonable care. See *Jones v.*

*S.S. & E. Corp.,* 112 Ill.App.2d 79, 94, 250 N.E.2d 829; also *Pantaleo v. Gamm,* 106 Ill.App.2d 116, 125, 245 N.E.2d 618."

Further, in interpreting the meaning of "wilful violations" or a "wilful failure to comply" with any of the provisions of the Act, we stated at page 476 in our opinion in *Dinschel v. United States Gypsum Co.* (1st Dist. 1967), 83 Ill.App.2d 466, 228 N.E.2d 106:

"All persons in 'charge' of the work are liable not only when the dangerous conditions are known to them, but also when by the exercise of reasonable care the existence of such dangerous conditions could have been discovered and become known to them. *Kennerly v. Shell Oil Co.,* 13 Ill.2d 431, 150 N.E.2d 134."

We find, after reviewing the evidence and the pertinent analyses of the Structural Work Act by courts of review in this jurisdiction, that plaintiff failed to sustain his burden of proof on the question of whether these defendants wilfully violated or wilfully failed to comply with the requirements set forth in the Act. It is manifest from a reading of the record that these defendants certainly did not know of the dangerous condition which occasioned plaintiff's misfortune; moreover, in our opinion, these defendants, in the exercise of reasonable care, could not have discovered or ascertained the existence of the dangerous condition.

The evidence below showed that Corbetta Construction Company, plaintiff's employer, bore the responsibility for covering over holes left for duct work and the like in the cement bays under construction; that Corbetta was responsible for the "shoring," "decking," and "stripping" operations on the construction site; that Corbetta employees, working directly under Earl Hauge, plaintiff's labor foreman, were responsible for covering over holes left in the concrete when the "decking" underneath was to be removed, and that covering the holes was the best practice; that Larry Forst, Corbetta's "job superintendent," coordinated the various trades on the job; that Earl Hauge could, if he felt the need, get electricians to string up lights; and that Hauge had the responsibility to see that there was an adequate supply of graphite paper to cover over the recently poured concrete.

There was also testimony in the court below that Western Electric provided the power for the electricity on the job, but that Western Electric did not supply the lighting; that each of the individual subcontractors were to provide their own lighting on the job, the electrical work to be undertaken by the firm of Fischbach, Moore & Morrisson, which was the electrical contractor for the construction project; and that Fischbach, Moore & Morrisson was under instructions to install the necessary temporary lighting for the job site.

■■ In light of all of the evidence presented before the trial court, in addition to that which was just recounted, we hold that the court

below did not abuse its broad discretion in refusing to permit plaintiff the opportunity to amend his complaint to include a Structural Work Act count at the close of plaintiff's case, and, absent some clear showing of abuse, we should not upset that determination (*Wiegel v. One LaSalle Co.* (1st Dist. 1966), 75 Ill.App.2d 272, 276, 221 N.E.2d 117). By virtue of our ruling on this issue, that defendants were not guilty of a "wilful violation" or a "wilful failure to comply" with the Act's provisions, we find it unnecessary to analyze the remaining elements plaintiff sought to prove in the court below, for there can be no liability under the Act without proof that the statute was violated wilfully. *Lavery* and *Gundich, supra.*

In arguing that the trial court's decision to disallow the amendment at the close of his case should be overturned, plaintiff relies upon *Blackwell v. Village of Stone Park* (1st Dist. 1972), 4 Ill.App.3d 708, 281 N.E.2d 432, and *Williams v. Stewart* (4th Dist. 1971), 2 Ill.App.3d 528, 275 N.E.2d 659. Again, we feel the reliance is misplaced.

The *Williams* case involved an effort to amend a complaint to make its allegations conform to the proof presented at trial in a situation where the evidence very clearly indicated that both parties proceeded in the trial with their sights firmly fixed upon the issue which was formally raised by the amendment. Thus, this court, in reversing the trial court's refusal to allow the amendment, maintained its liberal policy of allowing amendments in circumstances where to do otherwise would be to disregard the ends of justice. In the case at bar, on the other hand, the amendment sought arose in an entirely different and more complex set of circumstances; circumstances in which the trial court, in its sound discretion, could avail itself of the power to refuse the motion to amend upon the grounds that the proof presented in plaintiff's case-in-chief did not establish a case pursuant to the requirements of the Structural Work Act count sought to be incorporated by the plaintiff.

*Blackwell* involved the denial by the trial court of a proposed amendment with respect to a *single* allegation, one which had earlier in the proceedings been admitted by the defendant therein. The amendment plaintiff in the instant case proposed was certainly of far greater sweep and import than that for which leave to amend was sought in *Blackwell.*

## II.

The second issue presented for resolution is whether the court below erred in directing verdicts for Western Electric and Ragnar Benson at the close of plaintiff's evidence. Extensive argument was had before Judge Kowalski concerning not only whether plaintiff had presented sufficient evidence to carry the case to the jury on his common law negligence theory, but also regarding whether plaintiff's proof had been

sufficient to make out a case under Illinois' Structural Work Act.

In argument before the trial court on the motion for directed verdicts, counsel for defendants maintained that plaintiff's actions on the evening of the accident constituted contributory negligence as a matter of law, arguing that plaintiff needlessly shut off his only source of light, needlessly pulled up the plywood which had covered the hole, and needlessly stepped into the hole itself. Defendants also maintained in argument that plaintiff had not shown that a common law duty to provide a safe place to work extended to them as owner of the premises and management contractor for the construction, respectively.

Counsel for plaintiff, in contradistinction, argued that plaintiff had not been guilty of contributory negligence and that, in any event, any question concerning same, under the facts of the case, was one for the jury to decide.

■■ The prescribed standard to be followed by the courts in directing verdicts was enunciated by our supreme court in the oft-quoted case of *Pedrick v. Peoria and Eastern R.R. Co.* (1967), 37 Ill.2d 494, 229 N.E.2d 504. *Pedrick* announced that verdicts should be directed "* * * only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick*, at page 510.

■■ In *Reid v. Employers Mutual Liability Insurance Co.* (1st Dist. 1973), 14 Ill.App.3d 174, 302 N.E.2d 108, a workman sought to recover damages for injury sustained by him in the operation of a printing press, which injury was alleged to have occurred because of his employer's negligent safety inspections of the press. The workman's injury occurred when his hand was caught between two brass rollers of a printing press he was cleaning while the press was in operation. The jury returned a verdict for plaintiff, defendant's post-trial motions were denied, and an appeal was taken. The defendant in *Reid* argued on appeal, among other matters, that, at the time of the occurrence, plaintiff had not been in the exercise of due care for his own safety as a matter of law, and this court, in reversing the judgment below and remanding the cause for entry of a judgment for defendant notwithstanding the verdict of the jury, through Justice English stated at pages 177-178 of the opinion:

> "Usually, the question of whether plaintiff was in the exercise of due care for his own safety or was guilty of contributory negligence, is for the jury to determine, based on the facts, but when those facts 'rest solely upon his own testimony, and the attendant circumstances that are not in dispute, the Court then has the duty of determining, as a matter of law, whether he [plaintiff], in fact, used ordinary caution for his own safety.' (*Day v. Barber-Colman*

*Co.*, 10 Ill.App.2d 494, 511, 135 N.E.2d 231, 239.) In the present case, plaintiff was alone at the time of the accident and by his own testimony was in complete control of the cleaning process. He was told which machines to clean but was to determine himself what methods to use. The facts and circumstances concerning the accident itself * * * were derived from his testimony only, since no one was present other than plaintiff to tell about what happened. We may therefore determine, as a matter of law, whether plaintiff used ordinary care for his own safety, and we conclude that the manifest weight of the evidence establishes overwhelmingly that he did not. *Pedrick v. Peoria and Eastern R.R. Co.*, 37 Ill.2d 494, 510, 229 N.E.2d 504, 513."

██ After viewing and analyzing further evidence presented in *Reid,* the court went on to say at page 179:

> "Contributory negligence is defined as a lack of due care for one's own safety as measured by an objective reasonable man standard. (*Williams v. Brown Manufacturing Co.*, 45 Ill.2d 418, 261 N.E.2d 305.) When plaintiff had safer choices available to him, and when he elected a more dangerous way of doing his job, he became contributorily negligent as a matter of law. This is true even though an employee might be acting under general directions from his employer and thought he would lose his job if the work was not performed in the recommended fashion (*Fore, v. Vermeer Manufacturing Co.*, 7 Ill.App.3d 346, 287 N.E. 2d 526), and even though plaintiff had been cleaning the presses without incident for 17 years. This latter fact merely accentuates plaintiff's knowledge of the operation of the press and its inherent dangers. The test of negligence is not the frequency with which the act has been safely completed by plaintiff (or others), but whether plaintiff, at the time of the occurrence, used that degree of care which an ordinarily careful person would have used for his own safety under like circumstances. (*Francis v. Francis*, 9 Ill.App.3d 90, 291 N.E.2d 857; *Wills v. Paul*, 24 Ill.App. 2d 417, 164 N.E.2d 631.) We believe he did not."

██ In *Day v. Barber-Colman Co.*, cited above by the *Reid* court, a workman was found to have been contributorily negligent as a matter of law, where he was assisting in the installation of an unassembled overhead vertical door which fell upon him. In so holding, the *Day* court stated at 10 Ill.App.2d 511:

> "Where a plaintiff is thoroughly familiar with a possible hazard involved in the performance of his job and with the means to avoid such, the fact that at a particular time he may have been momentarily unmindful thereof, forgetful thereof, or have over-

looked the same does not absolve him from the duty of observing due care for his own safety: [citation]."

Plaintiff, in the instant case, was the sole source of information with respect to whether he was in the exercise of due care for his own safety at the time of his accident or whether he was contributorily negligent at that time. Moreover, the circumstances attendant to those facts surrounding his accident are not in dispute. Therefore, because these facts and circumstances of the accident emanated from his testimony alone, and because "no one was present other than plaintiff to tell about what happened" (*Reid v. Employers Mutual Liability Insurance Co., supra,* at page 178), we may determine whether plaintiff was guilty of contributory negligence as a matter of law. We find that plaintiff herein failed to use ordinary care for his own safety and that the manifest weight of the evidence presented on review abundantly establishes that he did not. *Reid, supra.*

Plaintiff had worked as a laborer for some 20 years prior to the occurrence herein involved, and had worked for Corbetta for some months, performing the same task in which he was engaged on the evening he fell. He was cognizant of the dangerous conditions with which the Bell Laboratories project was fraught, those which all large construction projects spawn by the nature of the work involved. He was aware that there were holes in the newly-poured concrete floor; he had previously seen the hole through which he fell; and, in fact, he may have covered it himself with the graphite paper he used in his job. He ventured into a totally dark area with merely the illumination afforded by his flashlight. He testified that when he was without the light from his flashlight, he could not see his hand in front of his face for the darkness. Yet he proceeded along, without light, and, in fact, without the help of his assistant who was within earshot and could have been summoned for assistance, to lift a large piece of plywood which, his experience should have told him, may have been covering an opening in the floor.

■■ Under these circumstances, we find that plaintiff was not in the exercise of due care for his own safety and that the directed verdicts entered in the court below in favor of defendants were not entered in error.

For these reasons, we accordingly affirm the judgments of the circuit court of Cook County.

Judgments affirmed.

HAYES, P. J., and STAMOS, J., concur.