EDWARD E. JACKSON, Plaintiff-Appellee, *v.* ILLINOIS CENTRAL GULF RAILROAD COMPANY, Defendant-Appellant and Third-Party Plaintiff-Appellee—(UNIVERSITY OF CHICAGO, Third-Party Defendant-Appellant.)

(No. 58821;

First District (2nd Division)—March 12, 1974.

Winston & Strawn, of Chicago (Edward J. Wendrow, Thomas P. Healy, and Patrick F. Healy, Jr., of counsel), for Illinois Central Gulf Railroad Company.

Louis G. Davidson & Associates, Ltd., and Francis J. Gariepy, both of Chicago (Louis G. Davidson and Robert B. Patterson, of counsel), for Edward E. Jackson.

Menk, Johnson & Bishop, of Chicago (Ronald T. Bishop, of counsel), for University of Chicago.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Edward Jackson (hereinafter plaintiff) sought by a personal injury suit to recover damages for an injury to his left hand allegedly caused by the negligence, and the wilful and wanton negligence, of the Illinois Central Gulf Railroad (hereinafter the railroad). Subsequently, the railroad filed a third-party complaint against the University of Chicago (hereinafter the university), basing its cause upon a written "side track" agreement which existed between the railroad and the university.

The third-party complaint contained three counts. Count I alleged that plaintiff's injury had been caused solely by the university's negligence and that the railroad was entitled, therefore, to full indemnity; count II alleged that the railroad and the university had been jointly negligent, and that, therefore, the railroad was entitled to contribution from the university; and count III alleged that the railroad was entitled to full indemnification from the university under the common law doctrine of "active-passive" negligence.

After denials of all the parties' motions for directed verdicts, plaintiff's case—as well as the third-party action—was submitted to a jury. The jury returned a verdict in favor of plaintiff against the railroad, finding the railroad to have been actively negligent, and a judgment of $125,000 in damages was entered upon the verdict. With respect to the third-party action, the jury returned a verdict in favor of the railroad on count II of its complaint, finding that the university had been guilty of

passive negligence. The court below then entered judgment in the railroad's favor in the amount of $62,500, representing the sum of contribution owing from the university.

The railroad and the university have appealed from the judgment entered in favor of the plaintiff, as well as from the judgment entered in the third-party action.

The issues presented to this court for review are:

(1) Whether the jury properly found that the railroad had been negligent and that plaintiff had been in the exercise of ordinary care for his own safety;

(2) Whether the railroad owed to plaintiff a duty to look for and warn plaintiff of the impending movement of railroad cars, located on a "spur track" maintained by the university, under which plaintiff was working;

(3) Whether there was sufficient evidence presented to warrant the submission to the jury of the issue of the railroad's wilful and wanton misconduct;

(4) Whether there was sufficient evidence presented to warrant the giving of an instruction to the jury concerning the plaintiff's lost future earnings;

(5) Whether the jury's award was so excessive as to warrant an order of a substantial remittitur by this court; and

(6) Whether the railroad was entitled to contribution from the university.

The pertinent facts can be summarized as follows:

Plaintiff, Edward Jackson, who was 27 years old at the time of the accident, testified that on November 6, 1967—the day of the accident—he was employed by the University of Chicago as a machine operator in the university's steam and power plant; that he had begun working in the power plant 2 months prior to the day of the accident, though he had worked as a janitor for the university for some years; that his main work in the power plant was to move a machine back and forth along a conveyor belt which brought coal to the plant in order to keep the university's coal bins full; that railroad coal cars would be brought by the railroad onto the university's elevated "spur track," located atop a trestle on the university's premises; that the coal cars were then emptied by university personnel into coal pits located directly underneath the spur track; that after the coal had been unloaded from the cars, it was brought down through a series of holes at the bottom of the pits to a conveyor belt underneath, which carried the coal to the power plant; that, on occasion, he would be requested to assist in unloading the coal from the cars; that it was the practice of railroad employees to warn workmen

before a railroad car would be moved on the spur track and that on three occasions while he was working near or underneath the track, he had observed a railroad employee walk down the track to give warning to the workmen; that on six or seven other occasions, he had observed railroad employees give similar warnings; that every time he had observed empty cars being moved, the railroad had followed that procedure; and that frequently a bell or a horn would be sounded before the railroad removed empty cars.

Plaintiff went on to testify that at approximately 1 P.M. on the day of the accident—a Monday—a request was made by Nathaniel Cornwell, plaintiff's senior co-employee to assist in the unloading of coal from the cars; that on the previous Friday, six coal cars had been run onto the spur track by the railroad and that he had assisted in unloading them; that the coal had become frozen over the intervening weekend and that it had formed an arch extending up to 6 inches from the top of a cross beam located between the tracks, though the coal beneath the arch had been removed; that because the coal had frozen and because there were too few workmen to do the job, Cornwell asked plaintiff to help break up the coal by going down into the pits and using a long "breaking bar"; that Cornwell told him to stand off to one side and break it up; that he told Cornwell that the suggested procedure was too dangerous in that he might slip and have tons of coal fall upon him, and that Cornwell asked if he, plaintiff, knew of a better way of doing the job; that, thereupon, he told Cornwell he would obtain a safety belt he had seen at the plant and would "work something out with the belt," and that Cornwell responded that he, Cornwell, had never used a belt before; and that he told Cornwell that he didn't want to chance hurting himself.

Plaintiff, continuing, testified that after having obtained the safety belt, which was 2 inches wide, one-quarter of an inch thick, and had a "D" ring on one end, he returned and attached a rope to one end of the belt; that, after having tied the belt on, he attached the other end of the rope to a side railing adjacent to a walkway alongside the tracks; that he first stood on one track and attempted to break up the coal, but that, because of a lack of leverage, he was not too successful; that he then went down through an opening between the west rail and the walkway, and, while standing underneath the coal arch, attempted again to break it up; that working in that position was the safest, he felt, because a concrete abutment located near where he was standing would deflect the coal should it have fallen; that, again being unsuccessful in breaking the arch, he proceeded to position himself on his knees, on top of the arch, underneath one of the coal cars, securing the rope to a bar under the car; that, at this juncture, he had no reason to anticipate that the

railroad would come onto the spur track with an engine without first warning him; that he chopped at the frozen coal with a long breaking bar for approximately 20 to 25 minutes; and that he was in plain view, in this position, to anyone walking along the spur track walkway.

Plaintiff testified further that he first realized that the railroad cars were about to begin moving when he heard a banging noise; that he then tried to loosen the safety belt, but was unable to do so because he had gloves on and that by the time he reached out again, the train had started moving, snapping him onto his back across a breaking beam; that he then scrambled up onto his knees and tried to loosen the belt again after he had removed his gloves, but was dragged over other beams; that, as he was being dragged, he threw up his hands and thereafter remembered nothing other than a blinding flash until he regained consciousness at the bottom of the pit into which he had fallen; that he didn't know how his hand had been run over by a railroad car, but that his hand felt "odd," and that when he looked at it, it was bleeding badly; that one of his co-workers jumped down into the pit, tied a rope for him, and lifted him out of the pit; that he was thereupon taken to a hospital; and that prior to the accident, his left hand had not been deformed in any manner.

Plaintiff's testimony further shows that subsequent to the accident, plaintiff underwent a series of nine operations on his left hand, which ultimately resulted in the amputation of the little, ring, and middle fingers of the hand; that prior to the injury, his yearly earnings were approximately $6,500; that, due to the injury, he was off of work some 18 or 19 months; that he then sought employment at several businesses, but was unable to secure same; that, during May of 1969, he began working on the university's security police force, had worked there steadily until the time of trial, had been promoted to the rank of sergeant, and was earning approximately $9,500 per year at the time of trial in the court below.

Dr. Louis Kolb, an orthopedic surgeon affiliated with Illinois Masonic and Cook County Hospitals at the time of trial, testified that he had examined plaintiff at Billings Hospital during the afternoon of November 6, 1967; that plaintiff had extensive injury to his left hand, with the fifth finger of the hand amputated just beyond the first knuckle; that the ring finger was amputated to the first joint of the finger, with skin loss over the long or little fingers of the hand; and that there was a laceration through the palm of the hand.

Dr. Kolb testified that he had X rays taken and that he decided surgery was necessary that day in order to prevent infection and to cover the bony parts of the hand with soft tissue; that surgery was performed; that

on November 9, 1967, plaintiff had a skin graft taken from his left thigh, in order that the skin be grafted over the tip of plaintiff's left hand middle finger, but that only 50% of the graft survived; that plaintiff was subsequently sent home from the hospital and underwent physiotherapy; that later, plaintiff developed flexion contracture of one of the joints of his middle finger; and that certain procedures were employed to correct the contracture, but that it recurred.

Nathaniel Cornwell, plaintiff's senior co-employee on the day of the accident, confirmed plaintiff's account of many of the surrounding circumstances prior to the accident, and then testified that during his work experience with the university, each time empty coal cars were to be replaced on the spur track by full cars, railroad employees would walk up and down the track area to make certain none of the workmen was underneath any of the cars and to warn the workmen of the impending move; and that he had not instructed plaintiff not to use the safety belt and had not heard anyone else instruct him to use it, but had not cautioned plaintiff against using it.

William Gansar, at the time of the accident the assistant supervisor at the university's power plant, testified that during his 15 years' experience, he had observed the car removal practices of the railroad on numerous occasions; that he had never observed an occasion when railroad employees failed to walk up the walkway to warn the workmen; and that it had been the railroad employees' custom to do so.

John Segeler, who, at the time of the accident, was the superintendent of the university's power plant, testified that during his 38 years' experience, he could not recall an occasion when a member of a railroad crew failed to walk down the spur track trestle to see if the track was clear prior to moving out the empty cars.

Paul Jones, who was the engine foreman in charge of the railroad's crew on the day of the accident, testified that he had never seen workmen working underneath the cars; that if he believed it was necessary to sound a warning prior to moving the empty cars, he would request the engineer to do so; that there was nothing to prevent him from walking the walkway to check to see if workmen were laboring under the cars; that he attempted to ascertain whether anyone was under the cars by looking on both sides of the cars, but that he did not walk up to see if men were working underneath; that it never had been the custom and practice for any member of the railroad to walk along the walkway prior to removing cars; and that, in his 20 years' experience as a railroad man, he had never seen, nor heard of, a workman tying himself to the underside of a railroad car.

Donald Cleghorn, the train's engineer on the day of the accident, testi-

fied that members of the train crew would not go back and check to see if the trestle was clear on a regular basis and that no member did so on the day of the accident; and that railroad employees would walk along the walkway only if they observed someone working on the track area.

Gibson Kahn, at the time of the accident the assistant general yardmaster for the railroad, testified that during winter months, it was an almost daily occurrence that cars loaded with coal would be brought onto the university's spur track; that the railroad's crew always had orders "to take all the precautions in the world to not injure anyone or themselves either. That's a standard instruction on a railroad. \* \* \* They look around to the best they can. They go back if it's safe to do so. \* \* \* [I]f it's not safe to do so they take a reasonably safe course, they look over, they can stand on the front end of the engine and look over and they can get on the ground and look under and look on both sides of the engine."

Also, there was admitted into evidence in the court below the following railroad safety rule:

> "Guidelines to Safety
> Illinois Central Railroad
>
> Compliance with rules is essential to safety.
>
> 191. Take these precautions and all other measures necessary to prevent injury when coupling onto or moving camp cars, cabooses, or cars on house, team, or industry tracks:
> (a) find out if anyone is in, under, or between such cars,
> (b) get everyone out from under or between cars,
> (c) warn everyone remaining in cars that coupling will be made, and
> (d) make certain that transfer plates and skids are in the clear."

Still further, there were submitted to the jury a series of special interrogatories regarding the jury's findings with respect to specific liability at the close of the evidence; these interrogatories, which we will number consecutively for our convenience, and the jury's findings relative to them, were:

> "(1) Did the defendant, Illinois Central Railroad Company, at the time and place in question conduct itself in a wilful and wanton manner which proximately contributed to cause the accident and injury in question?
> Yes——           No X
> (2) Did the defendant, Illinois Central Railroad Company, at the time and place in question conduct itself in a negligent manner which proximately contributed to cause the accident and injury in question?

Yes  X          No——

(3) Did the plaintiff, Edward Jackson, at the time and place in question conduct himself in a wilful and wanton manner which proximately contributed to cause the accident and injury in question?

Yes——          No  X

(4) Did the plaintiff, Edward Jackson, at the time and place in question conduct himself in a negligent manner which proximately contributed to cause the accident and injury in question?

Yes——          No  X

(5) If you find that the defendant, Illinois Central Railroad Company, a Corporation, was negligent and that said negligence was a proximate cause of the injury to the plaintiff, Edward Jackson, was said negligence active or passive?

Active  X          Passive——

(6) If you find defendant, Illinois Central Railroad Company, a corporation, negligent, was said negligence the sole, proximate cause of the injury to the plaintiff?

Yes——          No  X

(7) Did the third-party defendant, University of Chicago, at the time and place in question conduct itself in a negligent manner which proximately contributed to cause the accident and injury in question?

Yes  X          No——

(8) If you find that the third-party defendant, University of Chicago, a corporation, was negligent and that said negligence was a proximate cause of the injury to the plaintiff, Edward Jackson, was said negligence active or passive?

Active——          Passive  X ”

## I.

■■ At the outset, we note, with respect to special interrogatories numbers 2 (the railroad's negligence) and 4 (no contributory negligence) set out above, that the answers to each were favorable to plaintiff. The record before us reveals a failure on the railroad's part to object to these answers, as well as a failure to move to set them aside in its post-trial motion. The consequences of these failures to so object or so move is that the answers to numbers 2 and 4 are conclusive regarding the facts upon which the issues of liability depended. (*Taake v. Eichhorst* (1931), 344 Ill. 508, 509; *Quagliano v. Johnson* (3rd Dist. 1968), 100 Ill.App.2d 444, 447-448, 241 N.E.2d 187; *Huff v. Illinois Central R.R. Co.* (5th Dist.

1972), 4 Ill.App.3d 113, 117, 280 N.E.2d 256.) We are required, then, under the settled law in this state, to consider these special findings to have been fully supported by the evidence presented.

## II.

The first substantive issue with which we are confronted is whether the railroad owed plaintiff a duty to look for and warn him of the impending movement of coal cars, located on university premises, under which he was working at the time of the accident. The railroad, on appeal, urges that neither a general duty of due care with respect to plaintiff, nor any custom or practice of the industry, or even the dictates of its Rule 191, imposed upon it the duty of determining whether plaintiff had tied himself to the undercarriage of the coal car before the railroad proceeded to move same. The railroad contends that the custom and practice, whereby its employees would walk along the walkway to look for and warn workmen of the impending movement of the cars, related solely to determining whether university employees were working *about* the cars on the trestle or whether they were in the pit below the trestle. The railroad admits that its Rule 191 admonishes railroad employees to find out whether anyone is *under* the cars before undertaking to move them, but claims that the Rule has no application to the incident in question, in that the Rule relates only to workmen who might be *on the ground under the cars.*

Plaintiff, on the other hand, reasons that the railroad owed a duty to exercise ordinary care for the safety of plaintiff, who fell within a broad class of individuals to whom injury might foreseeably result by virtue of the railroad's negligent conduct.

■■ This State's supreme court in *Kahn v. James Burton Co.* (1955), 5 Ill.2d 614, 622, 126 N.E.2d 836, had occasion to address itself to the issue of the duty to exercise ordinary care; while the factual circumstances of *Kahn* are not analogous to those presented in the case at bar, the principles reiterated by the court, at page 622, are applicable here:

> "Every person owes to all others a duty to exercise ordinary care to guard against injury which may naturally flow as a reasonably probable and foreseeable consequence of his act, and the law is presumed to furnish a remedy for the redress of every wrong. The duty to exercise ordinary care to avoid injury to another does not depend upon contract, privity of interest, or the proximity of relationship, but extends to remote and unknown persons. (*Wintersteen v. National Cooperage and Woodenware Co.,* 361 Ill. 95.)"

In their treatise on the law of torts, Harper and James have said:

"[F]oreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful man would take account of it in guiding practical conduct. Just as this broadening of the quest adds to the risks which may make conduct unreasonably dangerous, just so does it add to the range of duty." Harper & James, The Law of Torts (1956 ed.), § 18.2, at 1020.

American Jurisprudence also discusses the standard of conduct with which we are dealing here:

"Thus, the requisite relationship may exist under certain circumstances because of the mere presence of the person injured, at least if he is a member of a particular class, in a place where he may be injured by the defendant's conduct, as, for example, where the presence of another may create a relation that imposes on the operator of a mobile machine or moving instrumentality a duty to maintain a lookout, or to warn persons in that vicinity of the path [of] a moving piece of machinery * * *." 57 Am.Jur. 2d *Negligence* § 37, at 385-386 (1971).

■■ Applying these stated principles to the case at bar, we conclude that the railroad owed plaintiff a duty to look for him and to warn him of the impending movement of the coal cars prior to their removal from the university's spur track. Plaintiff was working in an area where university employees would foreseeably be working, and he was engaged in labor which the railroad knew was often necessary during winter months, to wit: the breaking up of frozen coal. The railroad's duty was clear, not only from a reading of its Rule 191 and from a review of its established custom and practice, but also from an understanding of the basic legal tenets underpinning one's general duty to exercise ordinary care for the safety of others who fall within a class of individuals to whom injury might foreseeably result owing to one's negligent conduct.

In its argument on this issue, the railroad relies principally upon *Mieher v. Brown* (1973), 54 Ill.2d 539, 301 N.E.2d 307, which involved the question of the correctness of the dismissal of an amended complaint. The supreme court held that a truck manufacturer is under no duty to design a vehicle with a rear bumper, fender, or shield, so as to prevent injuries to a person colliding with the truck from the rear. The railroad claims that the holding in *Mieher* is applicable here, in that the railroad operated under no duty to anticipate that someone might tie himself to the undercarriage of a railroad car. Without belaboring the matter, we feel that the rationale and the holding of the *Mieher* case are wholly inapposite to the issues before this court.

## III.

The next issue for our consideration is whether sufficient evidence had been presented in the trial court to warrant the tendering to the jury of the issue of the railroad's possible wilful and wanton conduct. Although, by its answer to special interrogatory number 1, the jury found that the railroad was not responsible for wilful and wanton conduct, the railroad claims that the very submission of the question to the jury resulted in prejudicial error, basing its claim upon the rationale of *Scerrino v. Dunlap* (1st Dist. 1957), 14 Ill.App.2d 355, 144 N.E.2d 859. In *Scerrino,* both the questions of plaintiffs' wilful and wanton misconduct and plaintiffs' negligence were submitted to jurors by way of special interrogatories, and though the jury found plaintiffs not guilty of wilful and wanton conduct, the submission of the issue was held prejudicial error, in that the jury might well have concluded that plaintiffs were guilty of contributory negligence. The *Scerrino* court stated at page 365 of the opinion:

> "The submission of the issue of wilful and wanton conduct of plaintiffs here may, on first consideration, seem harmless, inasmuch as the jury found plaintiffs not guilty thereof in their answer to the interrogatories; nevertheless, since the question of negligence on the part of plaintiffs was also submitted to the jurors by special interrogatory, the jury may well have been led to conclude that plaintiffs were at least guilty of contributory negligence. *We find no evidence in the record to support* the special finding that plaintiffs were guilty of wilful and wanton conduct, and it was prejudicial error to submit this false issue to the jury." (Emphasis supplied.)

After having thoroughly reviewed the evidence, we conclude that the submission of this question to the jury was not the submission of a "false issue," as it was held to have been in *Scerrino,* for in the case at bar the record reflects evidence which might have led the jury to find the railroad guilty of wilful and wanton conduct, though the jury did not so find. *Scerrino,* therefore, is readily distinguishable from the instant case, in that the *Scerrino* record displayed *no evidence* to support the special finding; whereas here, the record supports the trial court's action.

## IV.

The railroad also asserts that the court below erred in tendering to the jury an instruction concerning plaintiff's lost future earnings when, the railroad claims, there had been adduced no evidence of same. No authority is cited by the railroad to support its argument on this point. ■■ Suffice it to say that considering plaintiff's life expectancy, the extent and permanent nature of his injury, and the effect of the injury on

his future ability to secure laboring employment, the jury could well have concluded that plaintiff's capacity to earn money in the future would be severely hampered and that he had suffered—and would continue to suffer—great pain. We think there is sufficient evidence in the record to have warranted the giving of instructions concerning plaintiff's loss of future earnings. *Martin v. McCarry* (4th Dist. 1971), 2 Ill.App.3d 650, 657, 275 N.E.2d 897.

## V.

The railroad further contends that the amount of the verdict is so grossly excessive that any affirmance of the judgments entered in the court below should be conditioned upon the filing of a substantial remittitur. We disagree, and, in so doing, we quote this state's supreme court in *Lau v. West Towns Bus Co.* (1959), 16 Ill.2d 442, 452-53, 158 N.E.2d 63:

> "[I]t has long been the law in Illinois that the amount of a verdict is largely within the discretion of the jury. *Kahn v. James Burton Co.*, 5 Ill.2d 614; *Bucher v. Krause,* (7th cir.) 200 F.2d 576, cert. den. 345 U.S. 997; *Holsman v. Darling State Street Corp.*, 6 Ill. App.2d 517. \* \* \*
>
> \* \* \* It is true that the verdict is large in comparison to the expenses of plaintiff, but we cannot limit compensable damages for pain and suffering to a set percentage of medical, hospital and kindred expenses. Costly surgery may result in complete recovery for one person, while the total of the foregoing expenses incurred by a multiple amputee may be small. Each verdict for a personal injury must be examined in the light of the particular injury involved, with humble deference to the discretion of the jury in making its determination and to the ruling of the trial judge on the post-trial motions. *Johnson v. Eckberg,* 94 Ill.App. 635."

## VI.

Finally, we consider whether the railroad was entitled to contribution from the university. The cross-appeal of the university is based on its theory that it was at most only passively negligent, therefore, the plaintiff is not entitled to indemnity from the university. On the other hand, the railroad contends it is entitled to the contribution under the provisions of a so-called side-track agreement between the university and railroad in effect, and unchanged, since September 17, 1928.

The jury found the railroad guilty of active negligence and the university guilty of passive negligence (see special interrogatories 5 and 8, *supra*). The jury then returned a verdict in favor of the railroad and

against the university, on count II of the railroad's complaint, which charged that the railroad and the university had been negligent. The trial court then entered judgment for the railroad and against the university, ordering it to contribute the sum of $62,500.

So far as is pertinent to this question, the 1928 agreement states:

> "The Shipper also agrees to indemnify and hold harmless the Railroad Company for loss, damage or injury from any act or omission of the Shipper, its employees, or agents, to the person or property of the parties hereto and their employees, and to the person or property of any other person or corporation, while on or about the Track; and if any claim or liability other than from fire shall arise from the joint or concurring negligence of both parties hereto, it shall be borne by them equally."

At the outset, it is to be noted that there is ample evidence to support the finding of the jury that the university was guilty of passive negligence. For example, there is evidence that the university telephoned the railroad to remove the empty cars and put in loaded cars; yet, its employees, with knowledge of the impending move of cars, requested the plaintiff to engage in breaking up the frozen coal and took no positive step to protect the plaintiff while he was performing the assigned work.

The university contends the side-track agreement does not provide for indemnity where there is a variance between degrees of fault, *e.g.*, active and passive negligence and that, in Illinois, an indemnity agreement will not be construed as indemnifying one against his own negligence unless such is required by the clear and explicit provisions of the contract. In other words, the university urges that if the railroad—an active tortfeasor—expected to be indemnified by a passive tortfeasor, the agreement would have had to expressly so state.

In support of its position, the university cites and principally relies upon *Booth-Kelly Lumber Co. v. Southern Pacific Co.* (9th Cir. 1950), 183 F.2d 902. It is urged that *Booth-Kelly* interpreted a similar agreement and held that the railroad is entitled to equal contribution when its negligence is "of the same character" as the industry and that the words "joint or concurring negligence," as used in the agreement, permits equal contribution where the parties are *in pari delicto.*

In addition, the university cites many cases in its brief in support of its theory. One is *Tatar v. Maxon Construction Co.* (1973), 54 Ill.2d 64, 294 N.E.2d 272, wherein our supreme court held that an indemnity agreement, which provided that a subcontractor would indemnify his general contractor, does not indemnify against the subcontractor's own negligence.

The indemnification agreement in *Tatar,* of course, is not the same as

that in the instant case. In reaching its decision, the supreme court stated at page 67:

"We have examined the authorities cited by the parties and many of those collected at 27 A.L.R.3d 663, and conclude that the contractual provisions involved are so varied that each must stand on its own language and little is to be gained by an attempt to analyze, distinguish or reconcile the decisions. The only guidance afforded is found in the accepted rule of interpretation which requires that the agreement be given a fair and reasonable interpretation based upon a consideration of all of its language and provisions."

■■ The agreement in question in this case has been in effect since 1928. Since that date, many decisions have set forth developing ideas and theories. Yet these parties did not deem it necessary to change the language. We believe the reason they did not is that the words "joint or concurring negligence of both parties hereto, it shall be borne by them equally" fairly and reasonably expressed their mutual intention. Those words, in consideration of the language of the entire side-track agreement, need no modification or additions. The language, in our opinion, clearly states that under the facts of this case, both the railroad and university shall be jointly liable. The trial court correctly ordered the university to contribute the sum of $62,500.

For these reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

STAMOS and LEIGHTON, JJ., concur.