ANITA BERNESAK,[1] Plaintiff-Appellee and Cross-Appellant, *v.* CATHOLIC BISHOP OF CHICAGO, Defendant-Appellant and Cross-Appellee.

First District (2nd Division)   No. 79-1517

Opinion filed July 1, 1980.—Supplemental opinion filed on denial of rehearing September 23, 1980.

[1]The caption name was so spelled; however, in her testimony plaintiff gave her surname as Bernasek.

Dowd, Dowd and Dowd, Ltd., of Chicago (Michael E. Dowd and Philip J. McGuire, of counsel), for appellant.

Fohrman, Lurie, Sklar & Cottle, Ltd., of Chicago (James L. Pittman, of counsel), for appellee.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff Anita Bernasek, an eighth-grade pupil at Our Lady of Charity School in Cicero, sustained serious and permanent personal injuries as she and 15 or 20 of her classmates played a game identified as "crack-the-whip" in the school playground. She brought an action against defendant Catholic Bishop of Chicago, a corporation sole and, following a jury trial, was awarded damages of $200,000 based upon wilful and wanton misconduct of defendant's agents and employees. Defendant appeals from the verdict and judgment and plaintiff cross-appeals therefrom.

The issues presented for review on appeal by defendant are whether: the court erred in denying its motions for a directed verdict and for judgment *non obstante veredicto*; plaintiff's theory of aggravation of her original injuries by defendant's action was timely pleaded and adequately proved; and the trial court erred in instructing the jury and in dealing with the jury's deliberations. On cross-appeal, plaintiff presents the issue of whether the trial court erred in denying her an additur or, alternatively, a new trial on the issues of lost income and lost future income. For the reasons which follow, we affirm in part, reverse in part, and remand for a partial new trial on damages.

Plaintiff's evidence, insofar as the issues are concerned, reveals that she and the other participants in the game had joined hands and run for three to five minutes before the whip cracked, resulting in the breaking of the line in the middle, where plaintiff was positioned, leaving her at the end of the remaining "whip," and ending in a flight through the air. She landed on her left leg and thigh, and half sitting and half lying on the ground crying. Two of her teachers, Sister Therese and Mrs. Ruther, who had been present in the playground during the game, asked if she was all right; she responded "no" and complained of pain in her left leg. Sister Therese attempted to raise plaintiff from behind, after she said she could

not do so herself. When weight was thus placed on plaintiff's left leg, she immediately felt a crumbling or tearing sensation in her left hip and described the ensuing pain as excruciating. The leg collapsed under her weight and she fell to the asphalt topping of the playground for a second time, now experiencing pain in her left hip as well as her left leg. Several other school staff members then appeared. Sister Therese and Mrs. Ruther decided to place her in a chair and each took hold of one arm, lifted her up and placed her in a chair during which time plaintiff was crying and pleading for school personnel to notify her mother. Julia Reed, a fourth grade teacher, approached and told her either that she was a nurse or had nursing experience and, although she only asked to look at plaintiff's leg, she pulled it outward and, when plaintiff screamed, she pushed it back in. When Mrs. Reed manipulated her leg, plaintiff experienced a terrible, sharp, grinding pain in her left hip. Thereafter, the authorities decided to call her mother and she was removed by ambulance summoned by her mother and sent to MacNeal Memorial Hospital.

Anna Marie Sassetti and Cathy Houdek, students at Our Lady of Charity School and plaintiff's classmates, testified substantially to the same facts. Anna Marie was the leader of the line and started making swerves. She turned and saw that the line was gone except for the girl next to her, thereafter seeing plaintiff lying on the pavement crying and observed Sister Therese trying to pull plaintiff up and telling her to get up while plaintiff was screaming that she couldn't and was unable to move her leg. She saw Sister Therese finally manage to pull plaintiff onto the chair as she continued to scream, and then plaintiff's leg began shaking as she got onto the chair. Cathy saw both Sister Therese and Mrs. Ruther there, standing and watching as they played "crack-the-whip." The line moved and then broke from the force of all the children who were playing. The children let go of hands, at which time plaintiff flew through the air as though she was skiing and then fell to the pavement on her hip. She saw Sister Therese try to move plaintiff, who started screaming because of the pain. A chair was brought to the playground and she sat plaintiff in the chair, during all of which time plaintiff was screaming from the pain. Cathy had played "crack-the-whip" at school almost every day before the date of the accident, in the presence of teachers including Sister Therese and Mrs. Ruther; she had never been told not to play the game.

Dr. Robert Kaminski testified that he conducted an examination of plaintiff at the hospital and found her entire left leg shortened and rotated externally, two classic symptoms of a fracture. X-rays revealed that she had a fracture involving the left hip with some displacement which required surgery in order to reduce the fracture and placement of a nail, plate and two screws to hold it in position. Her post-operative progress

was satisfactory and the fracture had healed; however, by January, 1973, it became apparent that plaintiff was developing a complication of the fracture known as avascular necrosis of the hip bone which occurs because the blood supply to the ball part of the hip is disrupted when a fracture is displaced or comminuted. This condition results from the bone being deprived of blood; it becomes softened and gradually collapses, deforms and dies. Further surgery was performed on February 20, 1973, a bone graft procedure, in an attempted revascularization of the area. Bone graft material was taken from the pelvis and packed into place in a pre-drilled hole in an effort to prevent further collapse and to establish better blood circulation. Due to the injury, plaintiff had a slight limp involving her left hip with a one-quarter of an inch shortening involving the left leg and atrophy of the left thigh muscles measuring 1½ inches compared to the right leg. He was certain that plaintiff would require future major surgery requiring total hip replacement.

Dr. Donald S. Miller, an orthopedic surgeon, testified in answer to a hypothetical question that based upon a reasonable degree of medical and scientific certainty the avascular necrosis of the hip might or could have been caused or aggravated by picking up, pushing and pulling on the left leg by school personnel after plaintiff first fell. Dr. Miller had not treated or examined plaintiff before testifying and had not seen any X rays of her injury prior to that time. On cross-examination, he conceded he did not "know" the blood supply was diminished by the initial trauma.

Defendant's evidence, as it related to the issues, revealed that Mrs. Miriam Ruther and Sister Therese, the latter acting as supervisor, were in the playground at the time of the accident. Mrs. Ruther saw the girls holding hands and formed in a line that seemed to move around in a kind of arch, one girl anchoring her hand on a fence and the line moving under her arm. The girls seemed to be moving joyously and exuberantly in the line when plaintiff and another girl lost hold and plaintiff's feet seemed to leave the ground, and she moved through the air some feet and then dropped. She thought the game the girls were playing was called "rattlesnake." She and Sister Therese went to plaintiff lying on the ground after the accident. She complained of pain and could not get up. A chair was brought and Mrs. Ruther, with the help of another, raised plaintiff under her armpits to a sitting position on the chair. Sister Therese saw the girls moving around with their hands joined together and did not recall having actually seen plaintiff fall. She did not attempt to lift plaintiff after her fall. In a previous deposition Sister Therese had said that she had seen plaintiff when she "sort of went up and came down" and acknowledged that the game plaintiff was playing "* * * was sort of like crack-the-whip." She further recalled having testified in the deposition that the school never permitted the game to be played by children. Any game

where children move around with their hands clasped has a risk involved of a child possibly getting hurt. The game had been played for about three minutes before the accident happened. She had seen the girls join hands before that. She knew of no written instructions to the children not to play games like this. Julia Reed, employed by defendant as a teacher, testified that she was at the other end of the playground when the injury occurred and saw plaintiff sitting on a chair after the accident. She did nothing to her, gave no instructions to anyone who was there with respect to her, and did not pull or push plaintiff's leg.

Defendant's motions for a directed verdict, both at the close of plaintiff's case and at the close of all the evidence, were denied. The jury returned its verdict in plaintiff's favor in the amount of $200,000 compensatory damages. It awarded no punitive damages and answered "yes" to a special interrogatory which asked: "Do you find from the evidence that the agents of the defendant were guilty of any wilful and wanton conduct which was a proximate cause of plaintiff's injury?" Post-trial motions filed by both parties are mirrored in the issues presented on appeal and cross-appeal and were denied.

## I.

Defendant argues first that the record fails to show any wilful and wanton misconduct by its agents and, because a parent or guardian is not liable for injuries to a child in the absence of such misconduct, the court erred in denying its motion for directed verdict, relying upon *Kobylanski v. Chicago Board of Education* (1976), 63 Ill. 2d 165, 170, 347 N.E.2d 705; *Nudd v. Matsoukas* (1956), 7 Ill. 2d 608, 131 N.E.2d 525; and *Cotton v. Catholic Bishop of Chicago* (1976), 39 Ill. App. 3d 1062, 351 N.E.2d 247. Defendant characterizes its involvement merely as "allowing school children * * * to run," an activity which was not inherently dangerous. Acknowledging evidence in the record that the children were playing "crack-the-whip" when plaintiff was injured, defendant points out that plaintiff gave no explanation for what caused her fall other than that "the line broke." The evidence reveals a sufficient basis upon which the jury could have found the requisite wilful and wanton misconduct, however. The children had clasped their hands in a line and were rushing forward together until the leader's turn caused the line to swerve around rapidly, which resulted in the break in the line with plaintiff, originally in the middle, now at the whip's end, causing her to fly through the air until she "smacked" onto the ground and sustained her injuries. The game described by the witnesses supporting plaintiff's theory finds close identity with a common dictionary definition of the game "crack-the-whip." (Webster's Third New International Dictionary 528 (1976).) It was a game defendant's employee and agent knew to be risky and

dangerous; yet, according to plaintiff's evidence, it was permitted to be played.

■■ The nature and character of wilful and wanton conduct have been reviewed many times by the courts. In the recent case of *Spring v. Toledo, Peoria & Western R.R. Co.* (1976), 44 Ill. App. 3d 3, 357 N.E.2d 1330, *affirmed* (1977), 69 Ill. 2d 290, 371 N.E.2d 621, the court observed (44 Ill. App. 3d 3, 7):

> "The Illinois Supreme Court has defined wilful and wanton conduct to be either an intentional injury or an act 'committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care.' *Schneiderman v. Interstate Transit Lines, Inc.*, 394 Ill. 569, 583, 69 N.E.2d 293; accord, *Brown v. Illinois Terminal Co.*, 319 Ill. 326, 150 N.E. 242; *Marquart v. Toledo, Peoria & Western R.R. Co.*, 30 Ill. App. 3d 431, 333 N.E.2d 558.) In attempting to elucidate the concept contained in the words wilful and wanton conduct, our Supreme Court in *Brown v. Illinois Terminal Co.*, 319 Ill. 326, 150 N.E. 242, commented as follows:
>
>> 'Such conduct [wilful and wanton] imports consciousness that an injury may probably result from the act done and a reckless disregard of the consequences. Ill-will is not a necessary element to establish the charge.' 319 Ill. 326, 331, 150 N.E.242, 244."

In the present case the jury could properly have inferred "consciousness that an injury may probably result * * * and a reckless disregard of the consequences * * *" on the part of the school and its agents.

Defendant also relies upon *Woodman v. Litchfield Community School District* (1968), 102 Ill. App. 2d 330, 242 N.E.2d 780, *Mancha v. Field Museum of Natural History* (1972), 5 Ill. App. 3d 699, 283 N.E.2d 899, and *Clay v. Board of Education* (1974), 22 Ill. App. 3d 437, 318 N.E.2d 153. In each of the last cited cases, the court found the evidence insufficient to support a claim of wilful and wanton misconduct, which defendant cites as authority for a like result here. In each of these cases, however, the institutions were not charged with the duty of anticipating and guarding against the wilful and wanton misconduct by other children who suddenly and apparently without provocation attacked the respective plaintiffs in each case. Under the evidence in the present case, however, the children were within school grounds and in full view of defendant's agents and employees, engaged in a form of play which the playground supervisor knew to be dangerous and risky.

## II.

Plaintiff also sought to impose liability upon defendant for aggravation of the injury she suffered in the fall by the subsequent action or inaction of its agents. This theory carries with it certain pleading and evidence problems, in the resolution of which by the trial court defendant identifies error. Plaintiff's original complaint was filed on January 13, 1973, sounding only in ordinary negligence. An amended complaint was filed July 28, 1976, alleging only wilful and wanton misconduct. On May 13, 1977, the case, then bearing a 1973 docket number, was dismissed without prejudice and refiled without changes as an original complaint under a 1977 docket number. On November 9, 1978, at the start of the trial, plaintiff sought leave to file an amended complaint, adding in the same count two additional allegations of wrongdoing which had not been included in the predecessor complaints. The first of these was contained in subparagraph 7(b)—1, which charged defendant by its agents, servants and employees with having "[w]ilfully committed a battery on minor plaintiff by lifting her after injury and pulling and shoving on her broken leg and hip which caused the bone fragments to sever the blood supply to the hip and caused additional injuries." Subparagraph 7(i) charged defendant by its agents, servants and employees "[w]illfully and wantonly provided inadequate and tardy medical care to minor plaintiff which aggravated the injuries received." Plaintiff also sought punitive damages as part of the new pleading.

■■ At the time the amended complaint was offered, defendant made no objection, but filed its answer denying the new allegations among the others. One week later, defendant moved to strike from plaintiff's complaint subparagraphs 7(b)—1 and 7(i) because those allegations alleged separate and distinct causes of action and should have been pleaded in a separate count on which separate forms of verdict could be offered; and because they constituted a new cause of action, the filing of which was not timely since it was filed two years after plaintiff had reached her majority on September 25, 1976, having been born on September 25, 1958. Defendant maintains that the amendments radically changed the nature of plaintiff's action, adding a charge of committing a malicious or intentional act in having pleaded a battery. Although separate and distinct causes of action should be pleaded in separate counts as required by section 33(2) of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 33(2)), this deficiency was at most a formal defect, rather than one of substance, and does not support defendant's assignment of reversible error. (Ill. Rev. Stat. 1977, ch. 110, par. 42(2); *Iverson v. Iverson* (1976), 38 Ill. App. 3d 308, 315, 347 N.E.2d 6.) The asserted radical change in the nature of plaintiff's action is also without support. Plaintiff did not plead either a "malicious" or an "intentional"

tort. Rather, she characterized the battery as "wilful." A battery in the context here pleaded carries with it neither malice (*Galvan v. Torres* (1956), 8 Ill. App. 2d 227, 234, 131 N.E.2d 367), nor intent to commit bodily harm (*Cowan v. Insurance Co. of North America* (1974), 22 Ill. App. 3d 883, 893, 318 N.E.2d 315), but need contemplate only, as in the case *sub judice*, an unauthorized attempt to render first aid by touching the victim's body against her wishes or without her consent (*Clayton v. New Dreamland Roller Skating Rink, Inc.* (1951), 14 N.J. Super. 390, 397-99, 82 A.2d 458, 461-62). With regard to the issue of limitations raised by defendant, it appears that plaintiff's amendment related to the same premises, on the same date and time, involving the same agents and employees of defendant who engaged in post-occurrence activities directly related to the accident in question and thereby "*   *   ** grew out of the same transaction or occurrence *   *   **". This brought the amendment within the intent and authority of section 46 of the Civil Practice Act without being barred by the statute of limitations. (Ill. Rev. Stat. 1977, ch. 110, pars. 46(1), (2); *Halberstadt v. Harris Trust & Savings Bank* (1973), 55 Ill. 2d 121, 302 N.E.2d 64; *Cain v. New York Central R.R. Co.* (1962), 35 Ill. App. 2d 333, 338-39, 182 N.E.2d 910.) *Mundt v. Ragnar Benson, Inc.* (1974), 18 Ill. App. 3d 758, 310 N.E.2d 633, and *Ennis v. Illinois State Bank* (1969), 111 Ill. App. 2d 71, 248 N.E.2d 534, upon which defendant relies are inapposite. In *Mundt*, the denial of leave to file her amendment was based upon the absence of evidence to support the proposed allegations. Likewise in *Ennis*, the court found an absence of evidence to support new charges of fiduciary relationship, agency and undue influence. Plaintiff's evidence in the case before us was sufficient to support the charges made in her amendment, as will be presently seen.

### III.

Defendant next claims that plaintiff's theory of aggravation of her injuries by actions after her fall was not supported by competent evidence and regards testimony given by Dr. Kaminski as having been devoid of any expert opinion supporting the theory "*   *   ** because timely objection was made and sustained when plaintiff questioned him in this area." Plaintiff identifies the same successful objection as having necessitated the testimony of Dr. Miller. Defendant argues, however, that it was error to allow Dr. Miller to testify over objection for several reasons: first, his name was never disclosed in answers to interrogatories, even though the court would have permitted defendant's attorney to interview him, citing *Kirkwood v. Checker Taxi Co.* (1973), 12 Ill. App. 3d 129, 298 N.E.2d 233; and second, Dr. Miller's testimony was substantively improper since he admitted on cross-examination that he

did not "know" if the circulation was impaired by the initial trauma of the fall, rather than by later events. Defendant invokes *Gertz v. Campbell* (1972), 4 Ill. App. 3d 806, 282 N.E.2d 28, *aff'd in part and rev'd in part* (1973), 55 Ill. 2d 84, 302 N.E.2d 40, for the proposition that before there can be any recovery for a claim of enhancement of injuries, there must be some proof as to what the injuries were before they were enhanced.

■ Reliance upon *Kirkwood v. Checker Taxi* is misplaced. There, the opportunity afforded defendants to interview an unlisted witness was limited to five minutes and was unsatisfactory because the witness had been with three other persons at the time of the accident, who could also have supplied the essential information and therefore would have had to have also been interviewed. Further, it appeared that the plaintiff there probably knew the name of the witness at the time when she answered interrogatories five months prior to the trial, but failed to disclose her identity. In the case at bar, no time limit was placed by the trial judge upon the interview afforded defendant. Moreover, his appearance as a witness was necessitated by unsuccessful efforts exerted by plaintiff, according to the testimony of a process server, to subpoena the medical expert originally intended. Plaintiff, therefore, could hardly have known of the need to call an additional expert in 1978 when she answered the interrogatories in 1976 with respect to the identity of her expert witnesses. The absence of prejudice to defendant may be inferred from trial counsel's remarks to the court, in contemplating Dr. Miller's prospective testimony, that he could "handle this testimony" and that he would "just take him cold," although he was surprised and would object to his testimony. We observe in passing that the need for Dr. Miller's testimony could have been obviated by the projected testimony by Dr. Kaminski, successfully objected to by defendant. *Gertz v. Campbell* does not apply in this regard. The same defendant here is called upon to respond in damages for the wrongful acts of its agents and employees, unlike the separate and distinct putative defendants involved in that case. For the foregoing reasons, defendant's further objection to the presentation of rebuttal testimony from John Emde, a physical education teacher at National College of Education, that if he had any reasonable doubt that a child's leg was fractured, he would not move the victim except in a life-threatening situation, must also fail.

## IV.

Error is also predicated upon the modification by the trial court of defendant's instruction No. 1 before giving it, by adding to its language the issue as to "supervising the physical well-being of the children in the playground." Defendant's objection to the modification was overruled

and the instruction was given. The basis for the objection is that the instruction, following the form of Illinois Pattern Jury Instructions, Civil, No. 20.01.01 (2d ed. 1971), included among the issues in the case the question of defendant's lack of supervision of post-occurrence activities in the absence of supporting evidence, relying upon *Schomer v. Madigan* (1970), 120 Ill. App. 2d 107, 255 N.E.2d 620, and *Wong v. Richards* (1973), 10 Ill. App. 3d 514, 294 N.E.2d 784. In contrast to the foregoing authorities there was evidence in the record in the present case upon which medical testimony was based which could have supported the jury's consideration of an enhanced injury following the fall. Plaintiff testified that she felt a pain in her left leg after she "smacked" onto the ground following her flight through the air. When Sister Therese attempted to raise her from behind and weight was placed on her injured left leg, she testified to a sensation of a crumbling or tearing sensation in her left hip, describing the ensuing pain as excruciating and the collapse of her leg under her weight falling to the pavement for a second time and now experiencing pain in her left hip as well as her left leg. When Mrs. Reed manipulated her leg she experienced a terrible, sharp, grinding pain in her left hip. Dr. Miller was advised of the foregoing evidence in the hypothetical question asked of him and it was his opinion that the injury might or could have been aggravated by virtue thereof and the circulation of the hip joint damaged, although, on cross-examination, he could not say that he "knew" that the blood supply had not been diminished as a result of the initial trauma. There was thus sufficient evidence upon which to base the subject instruction, leaving it to the jury to decide the issue thus raised. Although it may be said that the addition of the language of "supervising the physical well-being of children on the playground" could have more clearly advised the jury that the supervision mentioned related to the post-occurrence activities specifically, its failure to do so could not have prejudiced defendant and any error inherent in the absence of that explanation was harmless.

## V.

Defendant's assertion that it was error to deny the motions of counsel for both parties for mistrial after the jury was unable to reach its verdict during the four hours it deliberated on the first day is without support by any legal authority. The suggestion by defendant that the attorneys' concurrence that a mistrial was necessary highlights the probability error had been committed invites us to conjecture over a myriad of other reasons why the parties made the motion, entirely apart from the commission of error; this we decline to do. Further, the suggested possibility that the jury may have sought outside information during the overnight separation period, even though denied by them in a post-trial

voir dire conducted by the court, is equally evanescent and cannot be sustained as a ground for reversal under these facts.

## VI.

■■ With respect to the cross-appeal, plaintiff asserts that she is entitled to an additur or, alternatively, to a new trial on the issues of lost income and loss of future income because the evidence established the permanency of her injuries, the loss of employment which she secured but could not sustain because of her condition and her ambition of following an occupation with which her injuries were inconsonant. Plaintiff claims error in the trial court's refusal to give her instructions numbered 15, 16, 17 and 18, which requested damages representing lost income and the present cash value of income reasonably certain to be lost in the future, relying upon *Stewart v. DuPlessis* (1963), 42 Ill. App. 2d 192, 191 N.E.2d 622, *Redmond v. Huppertz* (1966), 71 Ill. App. 2d 254, 217 N.E.2d 85, *Bunch v. Rose* (1973), 10 Ill. App. 3d 198, 293 N.E.2d 8, and *Jackson v. Illinois Central Gulf R.R. Co.* (1974), 18 Ill. App. 3d 680, 309 N.E.2d 680. In *Stewart*, in an action for traumatic loss of an eye when the plaintiff was 11 years of age, the court held that because of permanency of injury and evidence relating to the effect of that injury upon his ability to secure work, an instruction requesting the jury to consider an amount of money as " 'the value of earnings lost and the present cash value of the earnings reasonably certain to be lost in the future' " was properly given. In *Redmond,* medical evidence revealed a brain injury with permanent loss of the sense of smell, disruption of the sense of taste, some loss of emotional control and a degree of epileptic activity, although that plaintiff participated thereafter in usual school activities and was fully and gainfully employed at the time of trial. The *Redmond* court concluded that an instruction on the future loss of earnings where evidence is adduced of some permanent injury to a minor child was proper even in the absence of testimony indicating that the injury sustained would impair plaintiff's ability to obtain some work or be gainfully employed. To the same effect are *Bunch* and *Jackson*. Defendant insists, however, that plaintiff's injury in the instant case is not of the same order as the permanency of injury in the foregoing cases because although she suffered a painful hip injury, that would not preclude her from holding most jobs. This, however, is a question for the jury to consider and it should have been instructed with respect to lost income and the present cash value of income reasonably certain to be lost in the future. It was error to remove these considerations from the jury.

■■ We decline to accept plaintiff's computations with respect to either element of lost income as a basis for entering an additur, a device which may be applied, if at all, to cases in which the inadequacy of the verdict is

due to the omission of a specific, liquidated form of damages (*Carr v. Miner* (1866), 42 Ill. 179; *James v. Morey* (1867), 44 Ill. 352), rather than unliquidated tort damages of the character here presented. *Hong v. Williams* (1955), 6 Ill. App. 2d 456, 128 N.E.2d 655.

For the reasons set forth above, the jury's verdict and judgment thereon in plaintiff's favor are affirmed. Denial of plaintiff's motion for a partial new trial is reversed, and the cause is remanded for a partial new trial solely on the question of plaintiff's lost income and present cash value of income reasonably certain to be lost in the future, if any.

Affirmed in part, reversed in part and remanded.

PERLIN, P. J., and STAMOS, J., concur.


## SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

Mr. JUSTICE HARTMAN delivered the opinion of the court:

Certain misapprehensions as to the nature of our disposition and the proceedings in this cause upon remand were evinced in defendant's petition for rehearing and require correction. We affirm the judgment on the issue of defendant's liability and the original money judgment entered thereon in the amount of $200,000; we reverse denial of plaintiff's motion for a partial new trial solely on the question of plaintiff's lost income and present cash value of income certain to be lost in the future, if any. Should any such damages be determined by the jury, the same shall be added to the amount of damages already determined to be $200,000. The jury sitting in the partial new trial must be carefully instructed that this is the sole issue for its determination without reference to liability and the damages already awarded. Accordingly, we suggest that the trial court include the following modification of Illinois Pattern Jury Instructions, Civil, Nos. 30.01 and 30.07 (2d ed. 1971) with the other appropriate instructions tendered to the jury:

> "It has already been determined that defendant is liable to plaintiff for plaintiff's injuries and that the amount of plaintiff's damages, other than those to be determined by you, is $200,000. You must fix the amount of money which will reasonably and fairly compensate her for any of the following elements of damage proved by the evidence to have resulted from the wrongful conduct of the defendant:
>
> > The value of earnings lost and the present cash value of earnings reasonably certain to be lost in the future.

Whether any of these elements of damages has been proved by the evidence is for you to determine. The amount thus determined by you, if any, shall be added to the amount already assessed as compensation for other elements of damages."

See *Thatch v. Missouri Pacific R.R. Co.* (1977), 47 Ill. App. 3d 980, 986-87, 362 N.E.2d 1064, *appeal denied* (1977), 66 Ill. 2d 637, and authorities therein cited; *Davis v. Yellow Cab Co.* (1971), 133 Ill. App. 2d 190, 193, 273 N.E.2d 35 ("a partial new trial [shall] be conducted on the sole issue of wages and earnings lost by plaintiff and that judgment be entered for plaintiff in the amount of damages already assessed by the court ($6,509.10) plus such additional amount for lost earnings and wages as the court shall find proper").

Accordingly, defendant's petition for rehearing is hereby denied, and the cause remanded consistent with the views herein expressed.

PERLIN, P. J., and STAMOS, J., concur.